STATE OF NORTH CAROLINA v. CARLETTE ELIZABETH PARKER

No. 556A99

(Filed 9 November 2001)

## 1. Appeal and Error— statement of facts—transcript references

The Rules of Appellate Procedure require that each party's statement of the facts be supported by references to pages in the transcript, the record, or exhibits, and parties are encouraged to provide specific and continual transcript references.

STATE v. PARKER

[354 N.C. 268 (2001)]

**2. Homicide— first-degree murder—premeditation and delib-eration—circumstantial evidence—sufficient**

The trial court did not err by refusing to dismiss first-degree murder charges for insufficient evidence of premeditation and deliberation where a plethora of individual circumstances joined together to indicate premeditation and deliberation in that the victim did not provoke defendant, defendant's conduct and state-ments after the killing showed premeditation and deliberation, defendant tried to conceal her involvement in the victim's death, there was significant evidence of brutality, there was lengthy mis-treatment and concealment of the body, and defendant's clear motive to kidnap and kill the victim was money.

**3. Kidnapping— first-degree—sufficiency of evidence of pur-pose—drive-through bank withdrawal**

There was sufficient evidence to prove first-degree kidnap-ping based upon the purpose of obtaining property by false pre-tenses where defendant forced the victim to accompany her through a drive-in teller window while defendant withdrew $2500 from the victim's account. Although defendant argues that she made no false representation which deceived the bank, defend-ant clearly misrepresented to the bank that the victim was volun-tarily present and consented to the transaction and could not have obtained the money had the bank known the truth.

**4. Evidence— prior crimes and acts—admissible as motive and modus operandi—temporally related**

The trial court did not err in the prosecution of defendant for kidnapping and killing an elderly woman by admitting evidence of defendant's prior unruly conduct at a bank which refused to cash her check or by admitting her prior felony convictions for forging the checks of an elderly woman for whom she provided care, a crime for which she had been put on probation and ordered to make restitution. The bank incident reveals defend-ant's frustration and need to find money, and her prior crimes are relevant as proof of motive as well as a similar modus operandi. Although the crimes were committed three years before the events in this case, defendant's restitution payments and proba-tion were ongoing and the incident in the bank occurred four days before the kidnapping and murder. N.C.G.S. § 8C-1, Rule 404(b).

## 5. Evidence— pepper spray and stun gun—not tied directly to crime—admissible

The trial court did not err in a capital prosecution for first-degree murder and kidnapping by admitting pepper spray and a stun gun found in defendant's car where defendant contended that the weapons were connected to the crime only by speculation, but the pepper spray's potential to leave stains was proper to discredit defendant's explanation of why she disposed of the victim's shirt, and there was medical evidence of marks on the victim consistent with the use of a stun gun. The argument that the weapons cannot be directly tied to the crime goes to weight rather than admissibility.

## 6. Evidence— pathologist's testimony—use of "homicide"— not a legal conclusion

The trial court did not err in a capital first-degree murder prosecution by allowing an expert in pathology to testify that the victim's death was a homicide where the doctor did not use the word "homicide" as a legal term of art. The testimony conveyed a proper opinion for an expert in forensic pathology.

## 7. Evidence— tape recorded interrogation—officers' comments

There was no plain error in a capital first-degree murder prosecution in the admission of comments from police officers on a tape of defendant's interrogation. The statements served primarily to elicit from defendant an explanation of what occurred during the time surrounding the victim's death; the operative facts on which the jury based its verdict appear to be defendant's varying explanations of the day's events rather than the comments of the interrogating officers.

## 8. Criminal Law— prosecutor's argument—not speculative

The trial court did not err in a capital first-degree murder and kidnapping prosecution by not intervening ex mero motu in the prosecutor's closing argument where defendant contended that the prosecutor argued facts outside the record, but the prosecutor created a scenario based on evidence before the jury. It was up to the jury to decide whether to accept his interpretation and inferences.

**9. Sentencing— capital—mitigating circumstances—no significant history of prior criminal activity—sixteen false pretense convictions**

The trial court did not err in a capital sentencing proceeding by submitting the statutory mitigating circumstance that defendant had no significant history of prior criminal activity where defendant had pled guilty to sixteen counts of obtaining property by false pretenses arising from the fraudulent appropriation of money from an elderly woman in her care. These nonviolent property crimes apparently arose during one brief period in defendant's life, and the court instructed the jury that defendant did not request submission of this mitigator. A rational jury could have concluded that defendant had no significant history of prior criminal activity.

**10. Sentencing— capital—proportionality review—standards not vague and arbitrary**

North Carolina's standards for proportionality review in capital sentencing are not unconstitutionally vague and arbitrary. The standards have been clearly set forth in numerous cases and the process permits defendants to submit any evidence relevant to whether they have been sentenced by an aberrant jury. The process is not susceptible to exact definitions or precise numerical comparisons, but allows the State and the defendant to fully argue their positions and the Supreme Court to utilize its experienced judgment.

**11. Sentencing— death penalty—not disproportionate**

A sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor, and the evidence fully supported the aggravating circumstances found by the jury. The sentence was not disproportionate in that defendant was convicted based on premeditation and deliberation, having kidnapped and eventually drowned a defenseless, elderly woman whose confidence defendant earned through her authority as a health-care provider. The victim undoubtedly experienced immeasurable terror throughout the kidnapping and murder, and, after the victim drowned, defendant washed the victim's clothes, re-dressed her, combed her hair, stuffed her body into a car, and attended a party, driving around for several hours the next morning with the corpse sitting next to her. The facts clearly distinguish this case from those in which a death sentence has been held disproportionate.

STATE v. PARKER

[354 N.C. 268 (2001)]

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Smith (W. Osmond), J., on 1 April 1999 in Superior Court, Wake County, upon a jury verdict finding defendant guilty of first-degree murder. On 5 January 2001, the Supreme Court allowed defendant's motion to bypass the Court of Appeals as to her appeal of an additional judgment. Heard in the Supreme Court 12 September 2001.

*Roy A. Cooper, Attorney General, by David Roy Blackwell, Special Deputy Attorney General, for the State.*

*Ann B. Petersen for defendant-appellant.*

WAINWRIGHT, Justice.

On 22 June 1999, Carlette Elizabeth Parker (defendant) was indicted for first-degree murder and first-degree kidnapping. Defendant was capitally tried before a jury at the 8 March 1999 Criminal Session of Superior Court, Wake County. On 30 March 1999, the jury found defendant guilty of first-degree-kidnapping and of first-degree murder on the basis of premeditation and deliberation and under the felony murder rule. On 1 April 1999, after a capital sentencing proceeding, the jury recommended a sentence of death for the first-degree murder conviction, and the trial court entered judgment in accordance with that recommendation. The trial court also sentenced defendant to a term of 100-129 months' imprisonment for the kidnapping conviction.

The State's evidence at trial tended to show the following facts: On 12 May 1998, defendant kidnapped and drowned Alice Covington (the victim). At the time of her death, the victim was eighty-six years old, stood five feet one and one-half inches tall, and weighed eighty-eight pounds. Defendant was thirty-four years old and weighed approximately 230 to 240 pounds. From December 1996 to March 1997, defendant served as the home health-care worker for Charles Holtz, a close friend of the victim. The victim and Holtz were both residents at Springmoor Retirement Village in Raleigh.

On the morning of 12 May 1998, defendant and the victim saw each other at a Kroger parking lot on Creedmoor Road in Raleigh. Between 9:00 and 10:00 a.m., three witnesses saw the victim and a heavyset black woman struggling on Strickland Road. According to the witnesses, when the heavyset woman attacked the victim, the victim tried to get away by hitting the heavyset woman over the head with her purse.

Later that afternoon, against the victim's will, defendant drove the victim to the First Union Market Street teller window in Smithfield and withdrew $2,500 from the victim's account. A heavy-set black woman gave the teller a withdrawal slip and the victim's driver's license. The teller looked into the car and saw the victim in the passenger seat, leaning against the car door. The victim was not moving and appeared to be napping.

Defendant drove the victim back to the Kroger parking lot; moved her to defendant's Ford Fiesta hatchback; and drove to defendant's trailer in Angier, North Carolina, where the victim drowned in the bathtub. Defendant undressed the victim's body, washed the victim's clothes, redressed the body, and put the body in the hatchback of defendant's car. Defendant then left in a separate vehicle and drove to a family party. After leaving the party, defendant drove around for several hours.

The next morning, defendant returned to the Kroger parking lot and transferred the victim's body to the front seat of the victim's car. Defendant drove the victim's car around Raleigh, Hillsborough, and Burlington for several hours. Finally, defendant left the victim's body in the car on a dirt road in Morrisville. Defendant walked to Davis Drive and caught a ride to a gas station. Defendant took a cab back to her car, went home, and drank wine coolers.

On 14 May 1998, a passerby discovered the victim's body and notified the police. The victim's body was lying across the front seat, with her head propped against the driver's side door, her chest under the steering wheel, and her feet on the right front floorboard. Investigators found substantial bruising around the victim's face, neck, hands, upper part of both arms, upper left back and shoulder area, and left wrist. The victim also had a laceration on her left wrist and lower left leg. The victim was dressed in blue slacks and a light pink nylon jacket. There was reddish discoloration on the lower portion of the jacket. Testing conducted prior to trial revealed that a pepper-spray container found in defendant's car emitted spray that left a pink stain on a clean sheet.

During their investigation, police conducted a series of interviews with defendant. During the first interview, defendant stated she saw the victim on 12 May 1998 in a Kroger parking lot between 1:00 and 3:00 p.m. Defendant said she and the victim drove to a car wash and then to the victim's home. Defendant said she remained at the victim's home for two to three minutes and then left. After defendant

made this statement, SBI Agent M.B. East told defendant that the victim had been found dead in her car in Morrisville. Defendant, remaining calm and emotionless, responded, "Oh really?" At the conclusion of the interview, defendant denied killing the victim or knowing who did. Defendant also denied having recently been to Morrisville or any banks in Smithfield.

During the second interview, defendant's demeanor changed. At first, defendant was conversational. Agent East told defendant that witnesses saw her in an altercation with the victim on Strickland Road. East also showed defendant a copy of the $2,500 check drawn from the victim's account and told defendant that a teller described the person who accompanied the victim when the money was withdrawn. Defendant then became visibly nervous. Her leg shook, and her knee bounced up and down. Agent East again asked defendant if she knew who murdered the victim. The defendant responded, "Possibly." However, defendant denied assaulting or accidentally killing the victim. While taking defendant home after the interview, Agent East heard defendant say, "I'm going to lose my job," and "I won't be able to take care of old people anymore."

On 16 May 1998, police conducted two more interviews with defendant. Defendant told Agent East and Raleigh Police Detective K.W. Andrews that she had a story and it would be kind of "far-fetched" but that she wanted to come clean and say what had transpired. As in her first interview, defendant said she saw the victim at the Kroger parking lot, and they went to a car wash. At this second interview, defendant claimed she ran into the victim between 10:00 and 11:00 a.m. as opposed to between 1:00 and 3:00 p.m. Defendant's story also became ambiguous about whether she and the victim rode together to the victim's home or took separate cars. Defendant said that after going to the victim's house, she and the victim returned to the Kroger parking lot; got into defendant's car; and drove to the First Union in Smithfield, where defendant cashed a check for $2,500. Defendant claimed the victim gave her this money to help defendant with her doll business. Defendant claimed she never stopped on Strickland Road with the victim.

According to defendant, she then drove the victim to defendant's trailer in Angier. The victim sat on the commode in a bathroom, and defendant filled the bathtub with water. Defendant said she left the bathroom, and when she returned, the victim's head had fallen into the water. Defendant sat the victim up and left the room again. When she returned, the victim's head was submerged. Defendant said she

grabbed the victim by the hair, pulled her out of the water, and tore the victim's shirt. Defendant slapped the victim across the face a couple of times, but the victim did not respond. Defendant vaguely described how the victim's head then slammed into the floor. Defendant carried the victim into the living room and placed her on the floor. Defendant removed the victim's clothes, washed and dried them, and redressed the victim without the torn shirt.

Defendant said the victim was unresponsive but the victim's hand may have twitched. Defendant admitted she did not perform CPR or call 911 despite being trained as a health-care professional who was certified in CPR. Defendant put the body in the hatchback of her Ford Fiesta and drove her other automobile, a truck, to a party in Durham. Defendant left the party and drove around for several hours before returning home. Once at home, defendant got into her Ford Fiesta and drove to a hotel where her husband was staying on Highway 70 East. The victim's body was still in the hatchback. Defendant did not tell her husband what had happened that day.

Defendant said she returned to the Kroger parking lot the next morning around 6:45 a.m. and moved the victim's body to the front seat of the victim's car. Defendant said the victim's body smelled, so she put two pillows on it. Defendant drove around Hillsborough and Burlington, ending up on a dirt road in Morrisville around 1:00 or 2:00 p.m. According to defendant, the car got stuck in the road, and defendant left the victim's body in the car with the engine running. Defendant caught a ride to a gas station, called a cab, returned home, and drank wine coolers.

In an additional interview, defendant admitted throwing the victim's purse out of the car window near Falls Lake. Defendant said she was afraid her fingerprints might be lifted from the purse and she might be implicated in the victim's death. Further, although she had previously denied it, defendant admitted she had a confrontation with the victim on Strickland Road. Defendant initially said she merely stopped the car to adjust the victim's seat, get gas, and massage a cramp from the victim's leg. At this point in the interview, however, defendant paused to consult with her attorney. Defendant then admitted she forcefully took the victim to the bank and the trailer against the victim's will. Defendant also conceded that although the victim had previously voluntarily written the withdrawal slip defendant used in Smithfield, the victim changed her mind about giving defendant the money before defendant forcefully took her to Smithfield to withdraw it. Defendant stated she and the victim did

have a disagreement on Strickland Road and the victim hit defendant with her purse. Defendant admitted she then grabbed the victim by her shirt and threw her into the car. Defendant also said the victim's shirt was actually torn when defendant forced the victim back into the car.

Dr. James Ronald Edwards, who was accepted at trial as an expert in pathology, performed the first autopsy on the victim on 15 May 1998. The autopsy revealed no obvious cause of death. There was no visible sign of an acute heart attack, stroke, brain hemorrhage, blood clot, aneurysm, or external strangulation. Dr. Edwards noticed indications of external trauma, including bruises on the victim's right and left wrists, left shoulder, face, and left side of the neck. Dr. Edwards also noted the lungs were congested and edematous. He testified this fluid in the lungs could be caused by drowning. Dr. Edwards concluded that a natural cause of death was not documented, but that "some external trauma appears to be present" and that "additional history may be helpful in coming to a final conclusion."

Dr. Robert L. Thompson, who was accepted at trial as an expert in forensic pathology, performed a second autopsy. This autopsy revealed no obvious fatal injury and no evidence of strangulation or disease in the victim. Moreover, Dr. Thompson specifically testified the victim did not die of a heart attack. Dr. Thompson further testified that two small, round, sightly reddened areas on the surface of the victim's skin could have been caused by a stun gun found in defendant's possession. In an amendment to the death certificate, Dr. Thompson listed the immediate cause of death as "drowning" and the manner of death as "homicide."

Dr. Wells Edmunson, who was accepted at trial as an expert in internal medicine, was the victim's doctor for twelve years. Dr. Edmunson testified that the victim's overall physical and mental health was excellent. Dr. Edmunson stated that the victim was an especially vibrant person for her age and that her blood pressure, respiration, and cholesterol readings were normal at her most recent physical.

Defendant presented evidence from Dr. Page Hudson that prior EKGs performed on the victim indicated some heart abnormalities. Dr. Hudson opined the victim could have died from a cardiac arrhythmia. Dr. Hudson also stated, however, that cardiac arrhythmia could result from stress and that a stun gun would produce such stress in a

person. Dr. Hudson further testified that he had not read defendant's statement to police and that reading this statement would be helpful. Finally, Dr. Hudson testified, "[T]here's an excellent chance that [the victim] drowned."

The State also introduced evidence concerning defendant's criminal history and prior conduct at area banks. On 7 August 1995, defendant pled guilty to sixteen felony counts of obtaining property by false pretenses from eighty-five-year-old Catherine Stevenson, for whom defendant provided care. J.C. Holder, who worked in May 1995 as an investigator with NationsBank, testified that he had investigated unusual activity in Stevenson's account. Holder went to Stevenson's home and asked her to come talk to a customer representative at the bank about the rapid depletion of her account. Defendant was with Stevenson at the time and drove Stevenson to the bank. When she arrived at the bank, Stevenson appeared angry and upset with defendant and did not want defendant "to have anything to do with her." At the bank, defendant admitted forging unauthorized withdrawals. Defendant said she made the unauthorized withdrawals when Stevenson was in the car. The amount missing from Stevenson's account was around $44,000.

After defendant pled guilty to those charges, the trial court suspended defendant's sentence and put her on probation for forty-eight months. The trial court also ordered defendant to pay restitution in monthly payments of $920.43. By 1 April 1998, defendant was over $4,000 behind in restitution payments. Cathy Clayton, the chief probation and parole officer in Johnston County, testified defendant expressed concern about how she would make her payments.

On 30 April 1998, defendant cashed a $2,500 check signed by Alice Covington and drawn on her Merrill Lynch cash management account. The transaction occurred at the drive-through window of the Crabtree First Union. Defendant was alone when she cashed the check. Later that day, defendant brought three money orders to the probation office. The three orders totaled $2,000 and had been purchased at the Crabtree Post Office. This post office is within sight of the Crabtree First Union. When asked where she got so much money, defendant responded that she had been making a lot of dolls.

On 8 May 1998, defendant attempted to cash a $600.00 check at the drive-through window at a First Union in Dunn, North Carolina. The teller informed defendant that she could not cash the check because defendant's account showed a low balance. Defendant began

yelling, honking her horn, and causing a disturbance. The teller eventually had to walk away from the window. Defendant came inside the bank and was again advised the check could not be cashed. Defendant began cursing and screaming. The police were called, but defendant left before they arrived.

[1] As a preliminary matter, we note that North Carolina's Rules of Appellate Procedure require that each party's statement of the facts be "supported by references to pages in the transcript of proceedings, the record on appeal, or exhibits, as the case may be." N.C. R. App. P. 28(b)(4); *see also* N.C. R. App. P. 28(c). In the present case, both the State and defendant failed to meet this requirement. The parties' statements of the facts at times go on for several pages before providing a transcript reference to several different volumes or to numerous consecutive pages in a volume. While we hold neither party in default in the present appeal, we encourage future parties to provide specific and continual transcript references.

## GUILT-INNOCENCE PHASE

[2] Defendant first assigns error to the trial court's denial of her motion to dismiss the charges of first-degree murder and first-degree kidnapping. Defendant argues that the State's evidence was insufficient to permit a reasonable juror to find beyond a reasonable doubt that defendant committed first-degree murder or first-degree kidnapping.

The law governing a trial court's ruling on a motion to dismiss is well established. "[T]he trial court must determine only whether there is substantial evidence of each essential element of the offense charged and of the defendant being the perpetrator of the offense." *State v. Crawford*, 344 N.C. 65, 73, 472 S.E.2d 920, 925 (1996). Evidence is substantial if it is relevant and adequate to convince a reasonable mind to accept a conclusion. *State v. Vick*, 341 N.C. 569, 583-84, 461 S.E.2d 655, 663 (1995). In considering a motion to dismiss, the trial court must analyze the evidence in the light most favorable to the State and give the State the benefit of every reasonable inference from the evidence. *State v. Gibson*, 342 N.C. 142, 150, 463 S.E.2d 193, 199 (1995). The trial court must also resolve any contradictions in the evidence in the State's favor. *State v. Lucas*, 353 N.C. 568, 581, 548 S.E.2d 712, 721 (2001). The trial court does not weigh the evidence, consider evidence unfavorable to the State, or determine any witness' credibility. *Id.*

Defendant first contends the State's evidence was insufficient to prove defendant intentionally killed the victim with premeditation and deliberation. "Premeditation requires the act to have been thought out beforehand for some period of time, no matter how brief." *State v. Bates*, 343 N.C. 564, 580, 473 S.E.2d 269, 277 (1996), *cert. denied*, 519 U.S. 1131, 136 L. Ed. 2d 873 (1997). Deliberation requires " 'an intent to kill, carried out in a cool state of blood, in furtherance of a fixed design for revenge or to accomplish an unlawful purpose and not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation.' " *State v. Davis*, 349 N.C. 1, 33, 506 S.E.2d 455, 472 (1998) (quoting *State v. Brown*, 315 N.C. 40, 58, 337 S.E.2d 808, 822-23 (1985), *cert. denied*, 476 U.S. 1164, 90 L. Ed. 2d 733 (1986), *and overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988)), *cert. denied*, 526 U.S. 1161, 144 L. Ed. 2d 219 (1999).

Circumstantial evidence and direct evidence are subject to the same test for sufficiency, *State v. Sokolowski*, 351 N.C. 137, 143, 522 S.E.2d 65, 69 (1999), and the law does not distinguish between the weight given to direct and circumstantial evidence, *State v. Adcock*, 310 N.C. 1, 36, 310 S.E.2d 587, 607 (1984). " 'Premeditation and deliberation generally must be established by circumstantial evidence, because both are processes of the mind not ordinarily susceptible to proof by direct evidence.' " *Sokolowski*, 351 N.C. at 144, 522 S.E.2d at 70 (quoting *State v. Rose*, 335 N.C. 301, 318, 439 S.E.2d 518, 527, *cert. denied*, 512 U.S. 1246, 129 L. Ed. 2d 883 (1994), *and overruled on other grounds by State v. Buchanan*, 353 N.C. 332, 543 S.E.2d 823 (2001)).

Circumstantial evidence is often made up of independent circumstances that point in the same direction. *Sokolowski*, 351 N.C. at 147, 522 S.E.2d at 71. These independent circumstances are like

"strands in a rope, where no one of them may be sufficient in itself, but all together may be strong enough to prove the guilt of the defendant beyond reasonable doubt. . . . [E]very individual circumstance must in itself at least *tend* to prove the defendant's guilt before it can be admitted as evidence. No possible accumulation of irrelevant facts could ever satisfy the minds of the [jurors] beyond a reasonable doubt."

*Id.* (quoting *State v. Austin*, 129 N.C. 534, 535, 40 S.E. 4, 5 (1901)).

When proving premeditation and deliberation, the strands in the rope of circumstantial evidence may include: (1) want of provocation on the part of the victim, *State v. Warren*, 348 N.C. 80, 103, 499 S.E.2d 431, 443, *cert. denied*, 525 U.S. 915, 142 L. Ed. 2d 216 (1998); (2) defendant's conduct and statements before and after the killing, including attempts to cover up involvement in the crime, *Sokolowski*, 351 N.C. at 144-45, 522 S.E.2d at 70; *Rose*, 335 N.C. at 318-19, 439 S.E.2d at 527; (3) the manner in which or means by which the killing was done, including evidence that the killing was done in a brutal manner or with use of grossly excessive force, *State v. Truesdale*, 340 N.C. 229, 235, 456 S.E.2d 299, 302 (1995); *State v. Van Landingham*, 283 N.C. 589, 599, 197 S.E.2d 539, 545 (1973); and (4) unseemly conduct toward the victim's corpse, including concealment of the body, *Rose*, 335 N.C. at 318, 439 S.E.2d at 527.

In this case, no direct evidence shows defendant killed the victim after premeditating and deliberating. Instead, a plethora of individual circumstances join together to demonstrate defendant killed the victim with premeditation and deliberation.

First, the victim did not provoke defendant. The victim was a slight, elderly woman, while defendant was a large, young woman. Defendant weighed twice as much as the victim; the victim was more than twice defendant's age. Defendant knew the victim through defendant's work as a health-care provider for the victim's close friend. The victim and defendant ran into each other by chance on the morning of the murder. Defendant lured the victim by acting as though she wanted to help the victim and eventually forced the victim to go to the bank and to defendant's trailer.

Defendant's conduct and statements after the killing also show premeditation and deliberation. In interviews with police investigators, defendant's accounts conflicted concerning the events surrounding the victim's death. Initially, defendant gave investigators false statements about her involvement in order to cover up her actions, saying she did not know who could have harmed the victim. Defendant later changed her story, stating she and the victim went to the bank and to defendant's trailer. Eventually, defendant admitted she forced the victim to go to the bank and to the trailer.

Additionally, the State's evidence showed defendant tried to conceal her involvement in the victim's death. Defendant threw away the victim's purse and torn shirt for fear defendant would be linked to the crime. After the victim drowned, defendant washed and dried the vic-

tim's clothes, redressed her, and combed her hair. Defendant hid the victim's body in the trunk of her car. Defendant drove the victim's body around for hours, potentially destroying evidence of the crime as the body deteriorated. While defendant claimed she intended to call the police, she instead left the car and body on a dirt road, telling no one of the crime.

Further, significant evidence was presented to show the brutality of the crime. First, at some point on the day of the murder, defendant ripped the victim's shirt and bruised the victim's face, neck, hands, and head. The State presented additional evidence that defendant burned the victim's neck with a stun gun and sprayed her with pepper spray. Moreover, the events leading up to the murder were lengthy. The victim and defendant were together much of the day, and defendant attacked the victim as early as 9:00 a.m. Finally, the evidence shows defendant forced the victim to ride to the bank and then to defendant's trailer, where defendant overpowered and drowned the victim. Though trained as a health-care worker and in CPR, defendant did nothing to revive the victim after the drowning.

Defendant's lengthy mistreatment and concealment of the body are also evidence of premeditation and deliberation. After the victim drowned in the bathtub at defendant's trailer, defendant stripped the body and washed the victim's clothing. Defendant then redressed the corpse and stowed it in the hatchback of her car. That evening, defendant abandoned the body to go to a party. The next day, she removed the body from her car, propped it up in the passenger seat of the victim's car, and covered it with pillows because the body was beginning to smell. Defendant then drove around for several hours with the dead body sitting next to her.

Finally, defendant's clear motive to kidnap and kill the victim was to obtain money. Defendant previously worked as a caretaker for an elderly woman and withdrew money from that woman's bank account without her knowledge. Defendant was convicted of sixteen felony counts of false pretenses and was ordered to make restitution payments. Defendant was in arrears thousands of dollars for these payments. Defendant was anxious about these payments and recently had an outburst at a bank when the bank refused to cash her paycheck. Moreover, two weeks prior to the murder, defendant cashed a $2,500 check drawn on the victim's account and used this cash to make restitution payments.

Viewed in the light most favorable to the State, the evidence in this case was sufficient to permit a jury to find defendant killed the victim with premeditation and deliberation. Accordingly, defendant's argument is without merit.

[3] In this same issue, defendant also contends the State's evidence was insufficient to prove one of the elements of first-degree kidnapping. Because kidnapping was the predicate felony for defendant's felony murder conviction, defendant argues both the kidnapping and felony murder convictions must be reversed.

Our statute defining first-degree kidnapping provides as follows:

(a) Any person who shall unlawfully confine, restrain, or remove from one place to another, any other person 16 years of age or over without the consent of such person, or any other person under the age of 16 years without the consent of a parent or legal custodian of such person, shall be guilty of kidnapping if such confinement, restraint or removal is for the *purpose* of:

(1) Holding such other person for a ransom or as a hostage or using such other person as a shield; or

(2) Facilitating the commission of any felony or facilitating flight of any person following the commission of a felony; or

(3) Doing serious bodily harm to or terrorizing the person so confined, restrained or removed or any other person; or

(4) Holding such other person in involuntary servitude in violation of G.S. 14-43.2.

(b) There shall be two degrees of kidnapping as defined by subsection (a). If the person kidnapped either was not released by the defendant in a safe place or had been seriously injured or sexually assaulted, the offense is kidnapping in the first degree and is punishable as a Class C felony. If the person kidnapped was released in a safe place by the defendant and had not been seriously injured or sexually assaulted, the offense is kidnapping in the second degree and is punishable as a Class E felony.

N.C.G.S. § 14-39(a), (b) (1999) (emphasis added).

Defendant argues the State provided insufficient evidence of the "purpose" strand in section 14-39(a)(1)-(4). The State argued at trial

and in its brief to this Court that defendant kidnapped the victim for the purpose of facilitating the felony of obtaining property by false pretenses. *See* N.C.G.S. § 14-39(a)(2). Specifically, the State argued defendant forced the victim to accompany her to the Smithfield bank so defendant could obtain money from the victim's account. Defendant then falsely represented to the bank that the transaction was being conducted with the victim's voluntary consent and presence. Defendant argues, however, that she made no false representation to the teller at the Smithfield bank that deceived the bank about the nature of the transaction. Accordingly, defendant contends the evidence is inadequate to show she obtained property by false pretenses, and the purpose element of the kidnapping charge is thus unsupported by the evidence.

Our statute defining obtaining property by false pretenses provides in pertinent part:

(a) If any person shall knowingly and designedly by means of *any kind of false pretense whatsoever*, whether the false pretense is of a past or subsisting fact or of a future fulfillment or event, obtain or attempt to obtain from any person within this State any money, goods, property, services, chose in action, or other thing of value with intent to cheat or defraud any person of such money, goods, property, services, chose in action or other thing of value, such person shall be guilty of a felony: Provided, . . . that it shall be sufficient in any indictment for obtaining or attempting to obtain any such money, goods, property, services, chose in action, or other thing of value by false pretenses to allege that the party accused did the act with intent to defraud, without alleging an intent to defraud any particular person, and without alleging any ownership of the money, goods, property, services, chose in action or other thing of value; and upon the trial of any such indictment, it shall not be necessary to prove either an intent to defraud any particular person or that the person to whom the false pretense was made was the person defrauded, but *it shall be sufficient to allege and prove that the party accused made the false pretense charged with an intent to defraud.*

N.C.G.S. § 14-100(a) (1999) (emphasis added).

This Court has previously set out the elements of obtaining property by false pretenses:

(1) a false representation of a subsisting fact or a future fulfill-
ment or event, (2) which is calculated and intended to deceive,
(3) which does in fact deceive, and (4) by which one person
obtains or attempts to obtain value from another.

*State v. Cronin*, 299 N.C. 229, 242, 262 S.E.2d 277, 286 (1980). An
essential element of the offense is that the defendant acted know-
ingly with the intent to cheat or defraud. *See State v. Blue*, 84 N.C.
807, 809 (1881). Moreover, the false pretense need not come through
spoken words, but instead may be by act or conduct. *State v.
Matthews*, 121 N.C. 604, 605, 28 S.E. 469, 469 (1897); *see also State v.
Houston*, 4 N.C. App. 484, 486-87, 166 S.E.2d 881, 883 (1969).

Particularly instructive in the instant case is *State v. Dixon*, 101
N.C. 741, 7 S.E. 870 (1888). In *Dixon*, the defendant was convicted of
obtaining property by false pretenses after he obtained $5.00 from
another by falsely representing that a third party sent the defendant
to obtain the money. *Id.* at 741, 7 S.E. at 870-71. In ruling the defend-
ant's motion to arrest judgment was properly denied, this Court
focused on the statutory language that a false pretense could occur
" 'by means of any forged or counterfeited paper, in writing or in
print, or by any false token, *or other false pretense, whatsoever.*' " *Id.*
at 742, 7 S.E. at 871 (quoting 1 N.C. Code § 1025 (1883)) (alteration in
original). This Court held the statutory prohibition on the use of any
"other false pretense, whatsoever," gave the statute an extremely
broad scope. *Id.* at 742-44, 7 S.E. at 871-72. Accordingly, the Court
stated, "If one falsely and with fraudulent design represents to
another that something material—something already said or done—
is true, when the same is not true, and it is calculated to mislead,
and does mislead," this representation is a false pretense. *Id.* at
742-43, 7 S.E. at 871.

Although our statutory provision defining false pretenses has
been amended since *Dixon*, our statute still prohibits "*any kind of
false pretense whatsoever.*" N.C.G.S. § 14-100(a) (emphasis added).
The statute thus retains the broad scope illustrated in *Dixon*. Fur-
ther, like the defendant in *Dixon*, defendant's actions in the present
case falsely represented material facts to the Smithfield bank—that
the victim wanted the money withdrawn and that the victim was will-
ingly present in the car at the drive-through window. In fact, the vic-
tim changed her mind about the withdrawal, and defendant forcefully
put the victim in the car and made her go to the Smithfield bank so
defendant could get money from the victim's account.

By passing the victim's driver's license to the bank teller while the victim sat trapped in the passenger's seat, defendant clearly misrepresented to the bank that the victim was voluntarily present and consented to the transaction. The bank teller's testimony indicates the materiality of defendant's misrepresentation: She proceeded with the transaction only after verifying that the identification provided matched the victim in the passenger's seat. Considering the evidence in the light most favorable to the State, it appears defendant's appropriation of money from the victim's account was possible solely because defendant misled the bank to believe the victim was voluntarily present and consenting to the transaction. Clearly, if the bank had known the truth, that defendant took the victim against her will and the victim no longer consented to the transaction, defendant could not have obtained the victim's money.

In short, when defendant presented the victim's withdrawal slip and driver's license to the Smithfield bank while holding the victim hostage in the passenger's seat, she made a false representation of a subsisting fact. Defendant falsely represented to the bank that the withdrawal was legitimate and had the continuing support of the victim. Because defendant's misrepresentation was clearly calculated to mislead and did in fact mislead, defendant's actions constituted a false pretense. Accordingly, because the "purpose" element of the kidnapping charge was satisfied, both the kidnapping and felony murder convictions were supported by sufficient evidence. Defendant's argument on this issue is without merit.

Defendant also briefly argues that even if the State presented sufficient evidence of kidnapping, the State failed to prove defendant murdered the victim in the course of the felony. Defendant makes this argument in a single sentence in her brief and offers no evidentiary support or legal citation for it. After reviewing the record and briefs in this case, we find defendant's argument is without merit. This assignment of error is overruled.

[4] Defendant next assigns error to the trial court's admission of evidence of defendant's conduct on 8 May 1998 and the details of her prior crimes. Defendant argues this evidence was relevant only as character evidence, and its admission affected the outcome of both phases of the trial.

North Carolina Rule of Evidence 404(b) provides:

Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in

conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

N.C.G.S. § 8C-1, Rule 404(b) (1999).

In essence, evidence of other offenses is admissible if it is relevant apart from showing a defendant's character. *State v. Weaver*, 318 N.C. 400, 403, 348 S.E.2d 791, 793 (1986). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1999). Evidence showing other crimes, wrongs, or acts and a propensity to commit them is admissible if it is relevant for some purpose other than to show that defendant has the propensity for the type of conduct for which he is being tried. *State v. Bagley*, 321 N.C. 201, 206, 362 S.E.2d 244, 247 (1987), *cert. denied*, 485 U.S. 1036, 99 L. Ed. 2d 912 (1988). The purposes set out in the statute are not exclusive. "[E]vidence is admissible as long as it is relevant to any fact or issue other than the defendant's propensity to commit the crime." *State v. White*, 340 N.C. 264, 284, 457 S.E.2d 841, 852-53, *cert. denied*, 516 U.S. 994, 133 L. Ed. 2d 436 (1995).

Defendant first argues the State improperly introduced evidence of her unruly conduct on 8 May 1998 at a bank in Dunn, North Carolina. A bank teller testified defendant attempted to cash a payroll check at the teller window on that day. When the teller refused to cash the check, defendant became visibly upset, honked her horn, and created a disturbance. Defendant then parked the car, entered the bank, and was again told the bank could not cash her check. Defendant began cursing and screaming, creating such a disturbance that the teller called the police. Defendant left before the police arrived.

The bank incident reveals defendant's frustration and need to find money for her restitution payments on the Friday before the Tuesday killing. This was relevant and admissible and is some evidence of defendant's motivation to commit the crime. Accordingly, defendant's argument regarding the admission of her conduct at the bank is without merit.

Second, defendant argues that admission of her felony record was improper. In 1995, defendant was convicted of sixteen counts of

obtaining property by false pretenses for forging checks of an elderly woman for whom she provided care. Defendant was put on probation and was ordered to make restitution payments. Defendant was thousands of dollars in arrears. Defendant's prior crimes are thus relevant as proof of motive, plan, and preparation. Moreover, defendant's *modus operandi* was similar in the crimes committed three years prior to the murder. *See State v. Penland*, 343 N.C. 634, 653-54, 472 S.E.2d 734, 744-45 (1996), *cert. denied*, 519 U.S. 1098, 136 L. Ed. 2d 725 (1997). The crimes shed light on defendant's urgent need for funds to make her payments and on her motive for the kidnapping and the ultimate murder. Accordingly, defendant's argument regarding the admission of her prior crimes is also without merit.

Defendant also argues the evidence of the prior crimes and bad act was inadmissible because it was temporally removed from the killing. However, remoteness in time between evidence of other crimes, wrongs, or acts and the charged crime is less significant when the prior conduct is used to show intent, motive, knowledge, or lack of accident. Indeed, " 'remoteness in time generally affects only the weight to be given such evidence, not its admissibility.' " *State v. White*, 349 N.C. 535, 553, 508 S.E.2d 253, 265 (1998) (quoting *State v. Stager*, 329 N.C. 278, 307, 406 S.E.2d 876, 893 (1991)), *cert. denied*, 527 U.S. 1026, 144 L. Ed. 2d 779 (1999). Here, the Friday bank incident occurred four days prior to the kidnapping and murder, providing close temporal proximity. The 1995 crimes were also temporally related. Although the conviction for obtaining property by false pretenses was three years before the events at issue here, defendant's restitution payments and probation were ongoing and explain her motive. Accordingly, we overrule this assignment of error.

[5] Defendant next assigns error to the trial court's admission of the pepper spray and stun gun found in defendant's car as well as evidence concerning how these weapons function. Defendant contends it was mere speculation that either weapon was connected to the offenses.

The law concerning the admissibility of a potential murder weapon is well established:

"Under our rules of evidence, unless otherwise provided, all relevant evidence is admissible. N.C.G.S. § 8C-1, Rule 402 (1988). ' "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than

it would be without the evidence.' N.C.G.S. § 8C-1, Rule 401 (1988). In criminal cases, ' "[E]very circumstance that is calculated to throw any light upon the supposed crime is admissible. The weight of such evidence is for the jury." ' *State v. Whiteside*, 325 N.C. 389, 397, 383 S.E.2d 911, 915 (1989) (quoting *State v. Hamilton*, 264 N.C. 277, 286-87, 141 S.E.2d 506, 513 (1965), *cert. denied*, 384 U.S. 1020, 16 L. Ed. 2d 1044 (1966))."

*State v. DeCastro*, 342 N.C. 667, 680-81, 467 S.E.2d 653, 659 (quoting *State v. Felton*, 330 N.C. 619, 638, 412 S.E.2d 344, 356 (1992), *overruled on other grounds by State v. Jackson*, 348 N.C. 644, 503 S.E.2d 101 (1998)), *cert. denied*, 519 U.S. 896, 136 L. Ed. 2d 170 (1996) (alteration in original).

Considering admission of the pepper spray, we note the State conducted a test to illustrate the pepper spray's use. This test revealed the pepper spray left a pink stain when sprayed on a clean sheet. Separate evidence showed the victim's jacket had a reddish stain on it that tested negative for blood. Moreover, defendant told investigators prior to trial that the victim's shirt ripped when defendant pulled the victim from the tub. Defendant stated she dried the victim's hair and washed the rest of her clothes but disposed of the victim's shirt. According to defendant, she disposed of the shirt because "the fingerprints would lift off of them quicker or whatever to implicate me or whatever."

Evidence is relevant if it negates a defendant's explanation of her actions. *State v. Collins*, 335 N.C. 729, 735, 440 S.E.2d 559, 562 (1994). Evidence that pepper spray was found in defendant's car and that this spray could leave a stain on garments was thus admissible to discredit defendant's explanation of the victim's death and defendant's subsequent disposal of the victim's shirt. The State sought to prove that defendant did not rip the victim's shirt while pulling her from the tub. Instead, the shirt was stained when defendant sprayed the victim with pepper spray during the murder. Defendant was then forced to destroy the shirt to conceal evidence of her crime. Accordingly, admission of the pepper spray and its potential to leave stains was proper to negate defendant's statement to investigators that she disposed of the shirt to eliminate her fingerprints. The fact that the State's evidence failed to show with complete certainty that pepper spray was used in the killing "impacted the weight of the evidence, not its admissibility." *DeCastro*, 342 N.C. at 681, 467 S.E.2d at 659.

Turning to admission of the stun gun, the State offered evidence from Dr. Thompson that a stun gun's electrodes leave small red marks on the skin. After examining the stun gun found in defendant's car, Dr. Thompson testified that two sets of marks on the victim's neck were consistent with the use of the stun gun. *See id.* at 681, 467 S.E.2d at 659-60 (admission of knife held proper despite absence of bloodstains or fingerprint testing, where medical examiner testified some of fatal wounds were consistent with infliction by the knife). Again, while the State was unable to provide definitive evidence defendant used the stun gun on the victim, Dr. Thompson's testimony concerning the stun gun's potential use was relevant evidence admissible for the jury's consideration. *See id.* at 681, 467 S.E.2d at 659.

Accordingly, the trial court did not err in admitting the pepper spray and stun gun into evidence and allowing the prosecution to demonstrate their functioning to the jury. Defendant's argument that the weapons cannot be directly tied to the crime goes to the weight, rather than admissibility, of the evidence. We overrule this assignment of error.

[6] Defendant next assigns error to the trial court's decision to allow the expert testimony of Dr. Thompson that the victim's death was a homicide. Defendant argues this was prejudicial because the expert was no more qualified than the jury to reach a legal conclusion.

North Carolina Rule of Evidence 704 provides that "[t]estimony in the form of an opinion or inference is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." N.C.G.S. § 8C-1, Rule 704 (1999). In interpreting Rule 704, this Court draws a distinction between testimony about legal standards or conclusions and factual premises. *HAJMM Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 586, 403 S.E.2d 483, 488-89 (1991). An expert may not testify regarding whether a legal standard or conclusion has been met "at least where the standard is a legal term of art which carries a specific legal meaning not readily apparent to the witness." *State v. Ledford*, 315 N.C. 599, 617, 340 S.E.2d 309, 321 (1986); *State v. Smith*, 315 N.C. 76, 100, 337 S.E.2d 833, 849 (1985). Testimony about a legal conclusion based on certain facts is improper, while opinion testimony regarding underlying factual premises is allowable. *HAJMM*, 328 N.C. at 586, 403 S.E.2d at 488-89.

For example, an expert may not testify regarding specific legal terms of art including whether a defendant deliberated before committing a crime. *State v. Weeks*, 322 N.C. 152, 166-67, 367 S.E.2d 895,

904 (1988). Additionally, a medical expert may not testify as to the "proximate cause" of a victim's death. *Ledford*, 315 N.C. at 617, 340 S.E.2d at 322. There was no error, however, where an expert characterized a death with the term "homicidal assault." *State v. Flippen*, 344 N.C. 689, 699, 477 S.E.2d 158, 164 (1996). That term was "not a legal term of art, nor [did] it correlate to a criminal offense." *Id.*

Here, Dr. Thompson used the word "homicide" to explain the factual groundwork of his function as a medical examiner. Dr. Thompson did not use the word as a legal term of art. He explained how he determined the death was a homicide instead of death by natural causes, suicide, or accident. Dr. Thompson's testimony conveyed a proper opinion for an expert in forensic pathology, and the trial court properly allowed it. Defendant's assignment of error is without merit.

[7] Defendant also assigns error to the trial court's admission of hearsay statements of police officers recorded on the tape of the officers' interrogation of defendant. According to defendant, when tapes of defendant's interrogations were played at trial, the jury heard comments from the interrogating officers concerning what defendant had done and what might happen at trial. Defendant concedes no objection was made to admission of these statements at trial and so review by this Court is limited to plain error. Defendant also urges this Court, in light of the death sentence imposed, to analyze the officers' statements for any prejudicial error. *See State v. Warren*, 289 N.C. 551, 553, 223 S.E.2d. 317, 319 (1976).

For an error at trial to amount to plain error, an "appellate court must be convinced that absent the error the jury would have reached a different verdict." *State v. Reid*, 322 N.C. 309, 313, 367 S.E.2d 672, 674 (1988). Under this test, defendant must meet a significantly heavier burden than that placed on a defendant who preserved her rights via timely objection under N.C.G.S. § 15A-1443. *Id.*

In the present case, defendant fails to meet the standard for plain error. The officers' statements served primarily to elicit from defendant an explanation of what occurred at the time surrounding the victim's death. Defendant's varying explanations of that day's events, rather than the comments of the interrogating officers, appear to be the operative facts on which the jury based its verdict. In short, we cannot conclude that any potential error in admitting the officers' statements caused the jury to reach a different verdict. Similarly, our thorough review of the record reveals no prejudicial error. *See*

*Warren*, 289 N.C. at 553, 223 S.E.2d at 319. Accordingly, defendant's assignment of error is overruled.

[8] In another assignment of error, defendant asserts the prosecutor argued facts outside the record in closing argument. Because defendant failed to object at the time, the standard on appeal is whether the argument was so grossly improper as to call for corrective action by the trial judge *ex mero moto*. *State v. Oliver*, 309 N.C. 326, 334-35, 307 S.E.2d 304, 311 (1983). "[D]efendant must show that the prosecutor's comments so infected the trial with unfairness that they rendered the conviction fundamentally unfair." *Davis*, 349 N.C. at 23, 506 S.E.2d at 467.

Trial counsel may argue every fact in evidence and any reasonable inference which arises therefrom, *State v. Call*, 353 N.C. 400, 417, 545 S.E.2d 190, 201 (2001), but arguments based on mere speculation are improper, *State v. Forney*, 310 N.C. 126, 132, 310 S.E.2d 20, 24 (1984). In the present case, during closing argument the prosecutor said:

> So think about this. 11:00 in the morning. When I ask you to think about this, you go back and think about the evidence, and you draw what conclusions you want to. Use your common sense. 11:00 in the morning. Strickland Road, an altercation. What does she do with Alice Covington at that point? She's certainly not going to carry her back in public. She certainly can't carry this woman to the bank in Smithfield unless by the time you get to the bank in Smithfield she's unconscious. But what happens during that six hours, 11:00 until 5:00 in the afternoon? What happens to her in that time? Maybe we go straight from Strickland Road to [defendant's] house. Maybe I drown her during that time. I've already gotten her to the point that she ain't saying nothing because she's given up on the struggle. Maybe I've hit her with the stun gun. Maybe I've hit her with the mace. Maybe I have bloodied her nose by that time, and now I'm going to drown her. But it don't all come off of her clothes, so I'm going to wash and dry those clothes and put her back out on the floor and comb her hair. Is there any reason to do that, other than to make her presentable so you can drive her right through that drive-in window when she's dead and prop her up in that corner over there? And [the teller] said she was just sitting over there, looked like she had nodded off. If at 11:00 in the morning Alice Covington has been kidnapped and this is 5:00 in the afternoon, Alice Covington

is either going to be raising sand going through that drive-in window or she's going to be dead.

Here, the prosecutor created a scenario based on evidence already before the jury, presenting a possibility of how events unfolded. Using the word "maybe" several times, he urged the jury to "think about this," "draw what conclusions you want to," and "[u]se your common sense." His argument was not based on mere speculation, but on a framework of facts in evidence. It was up to the jury to decide whether to accept his interpretation and inferences. After review of the record and briefs, we conclude the trial court did not err and defendant's assignment of error fails.

## SENTENCING PROCEEDING

[9] Defendant next assigns error to the trial court's submission, over defendant's objection, of the statutory mitigating circumstance that defendant had no significant history of prior criminal activity. *See* N.C.G.S. § 15A-2000(f)(1) (1999).

This Court recently addressed the standard applicable to submission of the (f)(1) mitigating circumstance:

> "In deciding whether to submit this statutory mitigating circumstance, the trial court must determine whether a rational jury could conclude that the defendant had no significant history of prior criminal activity. A defendant's criminal history is considered "significant" if it is likely to affect or have an influence upon the determination by the jury of its recommended sentence."

*State v. Greene*, 351 N.C. 562, 569, 528 S.E.2d 575, 580 (quoting *State v. Jones*, 339 N.C. 114, 157, 451 S.E.2d 826, 849-50 (1994), *cert. denied*, 515 U.S. 1169, 132 L. Ed. 2d 873 (1995)), (citation omitted), *cert. denied*, 531 U.S. 1041, 148 L. Ed. 2d 543 (2000). If the trial court determines a rational jury could conclude defendant had no significant history of prior criminal activity, the trial court must submit the mitigating circumstance to the jury. *State v. Wilson*, 322 N.C. 117, 143, 367 S.E.2d 589, 604 (1988).

In the present case, the evidence warrants submission of the (f)(1) mitigator. Defendant pled guilty in 1995 to sixteen counts of obtaining property by false pretenses. These convictions stemmed from defendant's fraudulent appropriation of money from an elderly woman in defendant's care. These nonviolent property crimes apparently arose during one brief period in defendant's life. Moreover, the

trial court instructed the jury that defendant did not request submission of the (f)(1) mitigator but that submission of the mitigator was legally required.

Submission of the (f)(1) mitigator appears especially appropriate when defendant's criminal history is compared to prior cases where submission of (f)(1) was required. *See, e.g., State v. Rowsey,* 343 N.C. 603, 619-20, 472 S.E.2d 903, 911-12 (1996) (trial court properly submitted (f)(1) over defendant's objection where defendant had convictions for two counts of larceny, fifteen counts of injury to property, and an alcoholic beverage violation and where evidence showed defendant had been involved in various other crimes; trial court's reasoning included the fact that defendant's prior convictions were primarily for property crimes), *cert. denied,* 519 U.S. 1151, 137 L. Ed. 2d 221 (1997); *State v. Buckner,* 342 N.C. 198, 233-34, 464 S.E.2d 414, 434-35 (1995) ((f)(1) properly submitted over defendant's objection where defendant's criminal record included seven breaking and entering convictions, a common-law robbery conviction, and a drug-trafficking conviction), *cert. denied,* 519 U.S. 828, 136 L. Ed. 2d 47 (1996); *Wilson,* 322 N.C. at 142-43, 367 S.E.2d at 604 (trial court erred in failing to submit (f)(1) where defendant was previously convicted of second-degree kidnapping, stored illegal drugs, and was involved in a theft).

In the present case, a rational jury could have concluded defendant had no significant history of prior criminal activity. *Wilson,* 322 N.C. at 143-44, 367 S.E.2d at 604. Accordingly, the trial court properly submitted the (f)(1) mitigating circumstance to the jury. Defendant's assignment of error is without merit.

## PRESERVATION ISSUES

Defendant raises four additional issues that she concedes this Court has previously decided contrary to her position: (1) the indictment failed to allege every element of first-degree capital murder, and this deprived defendant of her state and federal constitutional rights; (2) the trial court erred in instructing the jury that it had to unanimously find that the aggravating circumstance was not sufficiently substantial when considered with the mitigating circumstances to call for the imposition of the death penalty before it could answer Issue Four "no" and sentence defendant to life imprisonment without parole, and this violated defendant's state and federal constitutional rights; (3) the trial court's instruction to the jury in the penalty phase that it had the "duty" to impose the death penalty if it found that the

mitigating circumstances failed to outweigh the aggravating circumstance and that the aggravating circumstance was sufficiently substantial to call for the death penalty when considered with the mitigating circumstances, and this deprived defendant of her state and federal constitutional rights; and (4) the definition of mitigating circumstances in the trial court's charge to the jury was error, and this deprived defendant of her state and federal constitutional rights. Defendant makes these arguments to allow this Court to reexamine its prior holdings and to preserve these issues for any possible further judicial review. We have thoroughly considered defendant's arguments on these issues and find no compelling reason to depart from our prior holdings. These assignments of error are overruled.

## PROPORTIONALITY REVIEW

[10] Defendant next argues that this Court's standards for proportionality review are unconstitutionally vague and arbitrary.

After thoroughly reviewing our proportionality standards, we find they have been clearly set forth in numerous cases. *See, e.g., State v. Skipper,* 337 N.C. 1, 58-64, 446 S.E.2d 252, 284-88 (1994), *cert. denied,* 513 U.S. 1134, 130 L. Ed. 2d 895 (1995). This Court's proportionality review process permits a capitally convicted defendant to submit any evidence that is relevant to this Court's determination as to whether defendant has been "sentenced to die by the actions of an aberrant jury." *Gregg v. Georgia,* 428 U.S. 153, 206, 49 L. Ed. 2d 859, 893 (1976).

We recognize the proportionality review process is not susceptible to exact definitions or precise numerical comparisons. *See Skipper,* 337 N.C. at 64, 446 S.E.2d at 287. Instead, the process must allow broad consideration of all evidence relevant to the defendant's death sentence. Through such a process, both the State and the defendant may fully argue their positions on proportionality, and Court members may utilize their experienced judgment to determine whether the death sentence imposed was proportionate. *Id.*

In short, this Court's standards governing proportionality are not vague or arbitrary but instead provide broad boundaries to ensure that death sentences may be fully evaluated. Defendant's assignment of error is without merit.

[11] Having concluded that defendant's trial and capital sentencing proceeding were free from prejudicial error, we are required to review and determine: (1) whether the evidence supports the jury's

finding of the aggravating circumstance upon which the sentence of death was based; (2) whether the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. N.C.G.S. § 15A-2000(d)(2).

In the present case, the jury convicted defendant of first-degree murder based on malice, premeditation, and deliberation, and under the felony murder rule. The jury also found defendant guilty of first-degree kidnapping. Following a capital sentencing proceeding, the jury found one aggravating circumstance: the murder of Alice Covington was committed for pecuniary gain. N.C.G.S. § 15A-2000(e)(6).

Three statutory mitigating circumstances were submitted for the jury's consideration: (1) defendant has no significant history of prior criminal activity, N.C.G.S. § 15A-2000(f)(1); (2) the murder was committed while defendant was under the influence of mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2); and (3) the catchall mitigating circumstance that there existed any other circumstance arising from the evidence that any juror deems to have mitigating value, N.C.G.S. § 15A-2000(f)(9). Of these statutory mitigating circumstances, the jury found only (f)(2) to exist. Of the five nonstatutory mitigating circumstances submitted by the trial court, the jury found two to exist: (1) defendant's mother died when defendant was five years old, which adversely affected her emotional development; and (2) defendant suffered and suffers from a mental defect and/or impairment.

After thoroughly examining the record, transcript, and briefs, and reviewing the oral arguments, we conclude the evidence fully supports the aggravating circumstance found by the jury. Further, we find no indication the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. We turn then to our final statutory duty of proportionality review.

The purpose of proportionality review is to "eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden*, 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). Proportionality review also acts "[a]s a check against the capricious or random imposition of the death penalty." *State v. Barfield*, 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied*, 448 U.S. 907,

65 L. Ed. 2d 1137 (1980). In conducting proportionality review, we compare the present case with other cases in which this Court concluded the death penalty was disproportionate. *State v. McCollum*, 334 N.C. 208, 240, 433 S.E.2d 144, 162 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994).

We have found the death sentence disproportionate in seven cases. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997), *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983).

We conclude this case is not substantially similar to any case in which this Court has found the death penalty disproportionate. Defendant was convicted on the basis of malice, premeditation, and deliberation, and under the felony murder rule. "The finding of premeditation and deliberation indicates a more cold-blooded and calculated crime." *State v. Artis*, 325 N.C. 278, 341, 384 S.E.2d 470, 506 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990). Moreover, defendant kidnapped and eventually drowned a defenseless, elderly woman. *See State v. Cummings*, 353 N.C. 281, 307, 543 S.E.2d 849, 865, *cert. denied*, —— U.S. ——, 151 L. Ed. 2d 286 (2001). The victim was eighty-six years old, five feet one and one-half inches tall, and weighed eighty-eight pounds. The victim's age and size made her no match for defendant, who was thirty-four years old and weighed approximately 230-240 pounds. *See State v. Carter*, 342 N.C. 312, 329, 464 S.E.2d 272, 283 (1995), *cert. denied*, 517 U.S. 1225, 134 L. Ed. 2d 957 (1996).

After establishing a relationship with the victim and earning the victim's confidence through defendant's authority as a health-care provider for the elderly, defendant used the victim's trust to kidnap and eventually kill the victim so that defendant could steal money from the victim's bank account. Further, the victim undoubtedly experienced immeasurable terror throughout the kidnapping and murder. She was driven a great distance with no idea what was in store for her, only to be sprayed with pepper spray, shocked with a stun gun, and eventually drowned in defendant's trailer. Moreover,

STATE v. PARKER

[354 N.C. 268 (2001)]

after the victim drowned, defendant, a trained health-care provider, neither administered CPR nor called 911. Instead, defendant washed the victim's clothes, put them back on her, combed the victim's hair, and then stuffed the victim's body in the back of her car so defendant could attend a party. The next morning, defendant carried the body from her car. Defendant propped the body up in the passenger seat of the victim's car. Defendant then covered the body with pillows because the body was beginning to smell. Defendant drove around for several hours with the dead corpse sitting next to her. These facts clearly distinguish this case from those in which this Court has held a death sentence disproportionate.

Defendant contends the present case is similar to *State v. Young*, 312 N.C. 669, 325 S.E.2d 181, one of the cases in which this Court found a death sentence disproportionate. In *Young*, the defendant was nineteen years old. *Id.* at 688, 325 S.E.2d at 193. The defendant and two companions robbed and killed the victim. *Id.* The defendant stabbed the victim twice, but one of his companions "finished" the victim by stabbing him several more times. *Id.*

In the present case, defendant's crime is clearly distinguishable from that in *Young*. First, while the defendant in *Young* was only nineteen, defendant in the present case was thirty-four years old at the time of the murder and held a position of trust as a health-care provider trained in lifesaving techniques. *See Carter*, 342 N.C. at 330, 464 S.E.2d at 283. Moreover, while the defendant in *Young* stabbed the victim twice but his accomplice actually "finished" the victim, defendant in this case kidnapped the victim, assaulted her with pepper spray and a stun gun, drowned her, and then drove her body around in a car. Further, while the victim in *Young* apparently died in a brief period of time without prolonged fear, it is unquestionable in the present case that the victim felt isolated and afraid for an extended period during the kidnapping and then endured a long, painful death. Accordingly, the present case is clearly distinguishable from *Young* and the other six cases where this Court held a death sentence disproportionate.

We also compare this case with the cases in which this Court has found the death penalty to be proportionate. *McCollum*, 334 N.C. at 244, 433 S.E.2d at 164. Although we review all cases in the pool of "similar cases" when engaging in our statutorily mandated duty of proportionality review, "we will not undertake to discuss or cite all of those cases each time we carry out that duty." *Id.*; *accord State v. Gregory*, 348 N.C. 203, 213, 499 S.E.2d 753, 760, *cert. denied*, 525 U.S.

**WESTMINSTER HOMES, INC. v. TOWN OF CARY ZONING BD. OF ADJUST.**

[354 N.C. 298 (2001)]

952, 142 L. Ed. 2d 315 (1998). After thoroughly analyzing the present case, we conclude this case is more similar to cases in which we have found the sentence of death proportionate than to those in which we have found it disproportionate.

Whether a sentence of death is "disproportionate in a particular case ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *State v. Green*, 336 N.C. 142, 198, 443 S.E.2d 14, 47, *cert. denied*, 513 U.S. 1046, 130 L. Ed. 2d 547 (1994). Therefore, based upon the characteristics of this defendant and the crimes she committed, we are convinced the sentence of death recommended by the jury and ordered by the trial court in the instant case is not disproportionate.

Accordingly, we conclude defendant received a fair trial, free from prejudicial error. The judgments and sentences entered by the trial court, including the sentence of death for first-degree murder, must therefore be left undisturbed.

NO ERROR.