TYSON, Judge.
Ang Xanonh ("defendant") appeals from judgments entered after a jury found him to be guilty of two counts of first-degree murder and two counts of robbery with a firearm. We hold that any error at trial was non-prejudicial.
I. Background
The State presented evidence to show that in October 1994, Ballard and Maxine Satterfield (collectively, "the victims") were retired and resided on New Hope Road in Raleigh, North Carolina.
Around 4:30 p.m. on 29 October 1994, Bill Satterfield ("Satterfield"), the victims' adult son, visited his parents' house after his father failed to meet him for a scheduled golf game. Satterfield let himself in the back door of his parents' home with a key, walked upstairs, and observed some purses strewn across the bed and some papers on the floor. Satterfield discovered his father's body in the bedroom, covered by a bedspread and with a wound in his temple. Satterfield immediately called 911 and waited in the front yard.
Law enforcement officers responded to the scene and found Mrs. Satterfield lying face down with her hands under her chest in the foyer inside the front door. She was grasping a small red booklet, described as a "personal Bible," in her right hand. City-County Crime Bureau Crime Scene Investigator Herman Colvin ("Investigator Colvin") observed no sign of forced entry. The front door and storm door were closed, but unlocked. The house was neat and orderly, with the exception of one bedroom where a number of pocketbooks and papers were strewn on the bed. The pocketbooks were empty.
Investigator Colvin recovered a .22 caliber shell casing near Mrs. Satterfield's right elbow and a second shell casing from the floor in the bedroom where Mr. Satterfield's body was located. Autopsies showed that the victims both died instantaneously from a single gunshot wound to the head.
Three days later on 1 November 1994, Investigator Colvin found seven small red Bibles, similar to the one found in Mrs. Satterfield's hands, in a drainage ditch near the victims' and defendant's homes. Other similar Bibles were recovered fromseveral neighbors who had turned them into the police department after reading about the murders in the newspaper.
Investigators found fingerprints belonging to J.M. on the door and on a wall in the victims' home. J.M. was fifteen-years-old and lived with his mother and brother, Germaine Miles, directly across the street from the victims' house. The victims had previously complained to their son about the kids across the street playing loud music. Germaine was also identified as a suspect because at one time, his friend Vance Boose, had possessed approximately thirteen of the red Bibles similar to the one found in Mrs. Satterfield's hand.
At trial, J.M. testified that he had pleaded guilty to two counts of second-degree murder and two counts of armed robbery as a result of his involvement in the victims' murders. J.M. and defendant were "best friends." J.M. testified that around 10:00 a.m. on 29 October 1994, defendant visited J.M.'s house and displayed a small, black gun. Defendant stated, "Get up, and let's go, to [the pool hall] or whatever." J.M. got out of his bed and walked outside with defendant. Defendant proceeded to put gloves on his hands as he walked across the street towards the victims' house. Defendant stated, "I need to get something from these people."
Defendant and J.M. walked up the victims' driveway, and defendant rang the doorbell. J.M. stood about four or five feet behind defendant. When Mrs. Satterfield answered the door, defendant handed her a little red Bible he had obtained from J.M.'shouse. After Mrs. Satterfield took the little red Bible, defendant brandished a gun to her head, entered the victims' home, and asked for her husband. J.M. followed defendant into the house and remained about three or four steps inside the victims' home.
J.M. overheard defendant scream "real loud" from upstairs and say, "Wake up, old man." J.M. then heard one gunshot. Defendant ran back downstairs, asked Mrs. Satterfield for the keys, and shot her once in the head. Defendant asked J.M. if he "[saw] anything [he] wanted." J.M. responded, "No," and accompanied defendant up the stairs inside the house. Defendant and J.M. looked through some pocketbooks upstairs. J.M. found approximately twenty dollars, which he kept. Upon defendant's request, J.M. went into the other bedroom to "see if the old man [was] dead." Defendant and J.M. also obtained some money from Mr. Satterfield's wallet, which was located in the room where his body was found. After defendant and J.M. exited the residence, defendant gave J.M. around forty-five to fifty dollars.
Raleigh Police Department Detective Charlie Branch ("Detective Branch") testified regarding his investigation of the victims' murders. During his investigation, he met with J.M. because of fingerprints that matched J.M. were found in the victims' home. While at the police station, Detective Branch escorted J.M. to the restroom. Once inside, J.M. "started crying . . . [and] mentioned that he would tell me who the person was that shot the Satterfields." J.M. wrote the name "Ang" on a sheet of paper and would not say the name aloud as he was "afraid . . . of theconsequences." J.M. further stated he was afraid because he thought the "Suicidal Town Gang" would harm him or his family. J.M. "[h]ung out with some of the guys in the gang," and stated that defendant was a member of that gang. Detective Branch testified that, according to J.M., "to become a gang member, it was nothing to take a life. That was part of their initiation, to take a life."
Other evidence was presented, including testimony by Investigator Colvin that he found six cartridges to a gun in defendant's bedroom. Investigator Colvin also took possession of a loaded . 22 long rifle semi-automatic pistol that defendant's brother had owned in October 1994. Defendant's brother remembered cleaning the gun near the day of the murders and he noticed two bullets were missing. At least two cartridges found in the weapon discovered by Investigator Colvin were identical to those found in defendant's home.
Defendant presented evidence that none of the latent fingerprints collected from the victims' home belonged to him. The jury convicted defendant on all counts. The trial court sentenced defendant to two consecutive life sentences without parole for the first-degree murder convictions and also sentenced him for sixty-nine to ninety-two months for each armed robbery, to be served concurrently with the two life sentences. After this Court granted defendant's motion for writ of certiorari, defendant appeals.
II. Issues
The issues on appeal are whether the trial court erred by: (1) giving an additional instruction on acting in concert after the jury had been instructed and retired to deliberate; (2) admitting photographs depicting young Asian men displaying weapons in a gangster-type style that was seized from defendant's bedroom; and (3) allowing Detective Branch to testify to J.M.'s statement that initiation to the "Suicidal Town Gang" required taking a life.
III. Jury Instructions
A. Acting In Concert
The State did not request and the trial court did not give an instruction on acting in concert as a possible theory of guilt. However, after the jury charge, the State asked why the trial court did not instruct on acting in concert as part of the felony murder charge. Defendant objected and stated, "I would have objected to the acting in concert instruction had it been offered to be presented to the jury." The trial court responded that no such instruction had been given because the State failed to timely request it.
During jury deliberations, the jury presented a question to the court that stated, "If Ange [sic] was found not guilty, what if any changes could be made in [J.M.]'s plea bargain transcript?" After the jury had asked the question but prior to bringing the jury back into the courtroom, the trial court stated to counsel that it would instruct on acting in concert. Although defendant had objected when the State originally requested the instruction after the trial court had instructed the jury, defendant did notrenew or preserve his objection. After bringing the jury back into the courtroom, the trial court responded:
Members of the jury, this is not a question that's before you. We're here trying to find facts to make a determination as to whether or not the defendant is guilty or not guilty of that which he has been charged with. I am unable to answer your question because I do not engage in plea bargaining; this is a matter between the defendant and the State. So I have no answer for you to that charge.
However, in lieu of that question . . . , I'd like to give an additional charge which was requested as soon as we had left the Court earlier, and perhaps this will shed some light and help you in your decision process.
The charge is acting in concert. For a person to be guilty of a crime, it is not necessary that he himself to [sic] do all of the acts necessary to constitute the crime. If two or more persons act together with a common purpose to commit robbery with a dangerous weapon and are actually or actively or constructively present at the time the crimes are committed, each of them is responsible for the acts of the other done in the commission of robbery with a dangerous weapon.
So I charge that if you find from the evidence beyond a reasonable doubt that on or about the alleged date, Ang Xanonh, acting either by himself or acting together with [J.M.], had in his possession a firearm and took and carried away property from the person and the presence of the person without his voluntary consent by endangering or threatening the life with the use or threatened use of a firearm, the defendant, knowing that he was not entitled to take the property and intending to deprive that person of its use permanently, it would be your duty to return a verdict of guilty of robbery with a firearm.
Following this instruction and while the jury was still deliberating, the trial court acknowledged that defendant had notconsented to the instruction and that it "want[ed] the record to reflect that [the trial judge] did it on [his] own motion."
Defendant does not argue the instruction on acting in concert was unsupported by the evidence. Defendant argues that by framing the instruction on acting in concert as a direct response to the jury's question about what would happen to J.M. if defendant were acquitted, the trial court directly signaled to the jury that it should convict defendant of the charges against him.
B. Expression of Opinion by Trial Judge
A trial judge is prohibited from expressing an opinion in the presence of the jury regarding any question of fact to be decided by the jury. N.C. Gen. Stat. § 15A-1222 (2003). "In evaluating whether a judge's comments cross into the realm of impermissible opinion, a totality of the circumstances test is utilized." State v. Larrimore, 340 N.C. 119, 155, 456 S.E.2d 789, 808 (1995)
Not every ill-advised expression by the trial judge is of such harmful effect as to require a reversal. The objectionable language must be viewed in light of all the facts and circumstances, "and unless it is apparent that such infraction of the rules might reasonably have had a prejudicial effect on the result of the trial, the error will be considered harmless."
State v. Holden, 280 N.C. 426, 430, 185 S.E.2d 889, 892 (1972) (quoting State v. Perry, 231 N.C. 467, 57 S.E.2d 774 (1950); State v. Hoover, 252 N.C. 133, 113 S.E.2d 281 (1960)).
Here, following submission of the jury's question, the trial court clearly informed the jury that their question "is not a question that's before you." The trial court further explained, "Ihave no answer for you to that charge." The trial court also stated, "I'd like to give an additional charge . . . and perhaps this will shed some light and help you in your decision," and subsequently instructed the jury on acting in concert.
Under these facts, we hold the trial court erred in instructing the jury on its own motion after the jury had retired to deliberate and as a direct response to a question from the jury. Defendant has failed to show, under the totality of the circumstances, this improper action expressed an "impermissible opinion" regarding defendant's guilt to warrant a new trial. Larrimore, 340 N.C. at 155, 456 S.E.2d at 808.
IV. Photographs
Defendant argues the trial court improperly admitted into evidence photographs depicting young Asian men bearing weapons in a gangster-type style. Defendant asserts the photographs were irrelevant and were "not linked by any reasonable inference to these crimes." We disagree.
Under the North Carolina Rules of Evidence, "relevant evidence" is defined as, "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C. Gen. Stat. § 8C-1, Rule 401 (2003). Relevant evidence is admissible, while "[e]vidence which is not relevant is not admissible." N.C. Gen. Stat. § 8C-1, Rule 402 (2003). "If the proffered evidence has no tendency to prove a fact in issue in the case, the evidence is irrelevant and must beexcluded." State v. Coen, 78 N.C. App. 778, 780-81, 338 S.E.2d 784, 786 (citing State v. Perry, 298 N.C. 502, 259 S.E.2d 496 (1979)), disc. rev. denied, 317 N.C. 709, 347 S.E.2d 444 (1986). "In criminal cases, [e]very circumstance that is calculated to throw any light upon the supposed crime is admissible. The weight of such evidence is for the jury." State v. Parker, 354 N.C. 268, 288, 553 S.E.2d 885, 899 (2001) (quotations omitted), cert. denied, 535 U.S. 1114, 153 L. Ed. 2d 162 (2002).
The existence of a motive is, however, a circumstance tending to make it more probable that the person in question did the act, hence evidence of motive is always admissible where the doing of the act is in dispute. . . . Motive may be proved by declarations and other conduct of the person himself, or by evidence of facts which would naturally give rise to a relevant motive and from which such a motive may therefore reasonably be inferred.
1-4 Henry Brandis, Jr. and Kenneth S. Broun, Brandis and Broun on North Carolina Evidence § 110 (5th ed. 2004) (citations omitted).
Detective Branch testified without objection that J.M. had stated that defendant was a member of the "Suicidal Town Gang," which was "out of California and that to take a life was to become - to become a gang member . . . that was part of their initiation." J.M. also testified, without objection, that defendant was a member of the "Suicidal Town Gang." Defendant assigns error to the admission of three photographs seized during a search of the bedroom defendant shared with his brother. The photographs, which were not included in the record on appeal, were described by the prosecutor outside the presence of the jury as depicting young men, mostly Asian or Laotian, displaying weapons in "a very gangster-type style." The trial court admitted the photographs, over defendant's objection, because they had been "authenticated as matters that were found in [defendant's] room, and [the] purpose for allowing it is they were found in the room - in the same room the weapon was in, and that he occupied that room. . . . They were items that were found in that particular room."
The photographs found in defendant's room, along with Detective Branch and J.M.'s testimony regarding defendant's gang activity, could allow the jury to reasonably infer defendant's motive in the murders. The trial court did not abuse its discretion in concluding the photographs were relevant.
The trial court may exclude relevant evidence if:
"its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.C.G.S. § 8C-1, Rule 403 (1992). The decision whether to exclude relevant evidence under Rule 403 "is a matter left to the sound discretion of the trial court." State v. Stager, 329 N.C. 278, 308, 406 S.E.2d 876, 893 (1991).
State v. Collins, 335 N.C. 729, 734-35, 440 S.E.2d 559, 562 (1994). Defendant asserts the trial court abused its discretion because the photographs were "highly inflammatory and likely to cause the jury to presume guilt on an improper basis." Defendant argues, "the evidence was certain to predispose the jurors to believe that defendant was like the people depicted in the photographs, that he was or wanted to be a member of a gang, and that a gang member was more likely to commit a murder than someone who was not involvedwith gangs." Defendant concedes the State presented evidence that defendant's brother was a member of the "Suicidal Town Gang," and that defendant and J.M. engaged in activities with members of the gang. This evidence was presented and received without objection by defendant.
Defendant failed to include the photographs in the record on appeal. His argument that the photographs were unfairly prejudicial is without merit considering the other evidence and testimony presented by the State and received without any objection by defendant. Defendant has failed to show the trial court abused its discretion in admitting the photographs into evidence. This assignment of error is overruled.
V. Hearsay Evidence
Defendant contends the trial court committed plain error by allowing Detective Branch to testify regarding statements made to him by J.M. We disagree.
Detective Branch testified, without objection, that during his investigation, J.M. told him, " there were quite a few of the gang members and they were out of California and that to take a life was to become - to become a gang member, it was nothing to take a life. That was part of their initiation, to take a life." J.M. also testified at trial. He was cross-examined regarding the violent nature of the "Suicidal Town Gang" and acknowledged that a prospective gang member had to be "beat in." Under the North Carolina Rules of Evidence, hearsay statements are inadmissibleunless the statement is permitted by statute. N.C. Gen. Stat. § 8C-1, Rule 802 (2003).
"Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C.G.S. § 8C-1, Rule 801(c) (1999). "[W]henever an extrajudicial statement is offered for a purpose other than proving the truth of the matter asserted, it is not hearsay." State v. Maynard, 311 N.C. 1, 15-16, 316 S.E.2d 197, 205, cert. denied, 469 U.S. 963, 83 L. Ed. 2d 299 (1984).
State v. Braxton, 352 N.C. 158, 190, 531 S.E.2d 428, 447 (2000), cert. denied, 531 U.S. 1130, 148 L. Ed. 2d 797 (2001).
We agree with defendant's argument that the State offered this testimony to prove the truth of the matter asserted. Detective Branch's testimony neither corroborated J.M.'s testimony nor falls under any recognized exception within the North Carolina Rules of Evidence.
Defendant, however, failed to object to Detective Branch's testimony at trial. Based on his failure to object, we apply a plain error analysis to determine whether defendant is entitled to a new trial.
[T]he plain error rule . . . is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a fundamental error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done, or where [the error] is grave error which amounts to a denial of a fundamental right of the accused, or the error has resulted in a miscarriage of justice or in the denial to appellant of a fair trial or where the error is such as to seriously affect the fairness, integrity or public reputation of judicial proceedings orwhere it can be fairly said the instructional mistake had a probable impact on the jury's finding that the defendant was guilty.
State v. Lemons, 352 N.C. 87, 96-97, 530 S.E.2d 542, 548 (2000) (alteration in original) (citations and quotations omitted), cert. denied, 531 U.S. 1091, 148 L. Ed. 2d 698 (2001). "Before deciding that an error by the trial court amounts to 'plain error,' the appellate court must be convinced that absent the error the jury probably would have reached a different verdict." State v. Harrison, 328 N.C. 678, 685, 403 S.E.2d 301, 306 (1991) (citation omitted).
Defendant has failed to prove this statement prejudiced his trial. J.M. accompanied defendant when he committed the murders and testified to the events surrounding the victims' deaths. Detective Branch corroborated J.M.'s testimony. Excluding Detective Branch's testimony that initiation into the "Suicidal Town Gang" required "taking a life," the State presented other overwhelming evidence of defendant's guilt. We are not convinced that but for the trial court's error in admitting this portion of Detective Branch's testimony, the jury would have reached a different verdict. Id.
VI. Conclusion
The trial court did not express an "impermissible opinion" by giving the additional jury instruction on acting in concert after the jury had retired to deliberate. Larrimore, 340 N.C. at 155, 456 S.E.2d at 808. Defendant failed to renew his objection to the acting in concert instruction. The trial court did not err byadmitting the photographs found in defendant's bedroom. The trial court erred in admitting hearsay statements during Detective Branch's testimony. J.M. testified and was cross-examined by defendant's counsel. The trial court's error does not constitute plain error and does not warrant a new trial. Defendant received a fair trial free from prejudicial error.
No Prejudicial Error.
Judges CALABRIA and ELMORE concur.
Report per Rule 30(e).