STATE OF NORTH CAROLINA v. ALEX JEROME TROGDON

No. COA10-1344

(Filed 20 September 2011)

**1. Evidence—expert testimony—death certificate—autopsy report—homicide—manner of child's death**

The trial court did not commit plain error in a second-degree murder case by admitting expert testimony, a death certificate, and an autopsy report that the cause of the child victim's death was homicide. The expert witnesses and the exhibits did not use the word "homicide" as a legal term of art. The expert witness's use of the word "homicide" to explain the manner of death as opposed to accidental means was permissible.

**2. Evidence—expert testimony—bite marks**

The trial court did not abuse its discretion in a second-degree murder case by allowing a doctor to testify that, in her professional opinion, the bite marks on the child victim's arm were made by defendant. Even assuming *arguendo* that defendant properly objected and the testimony was inadmissible, defendant failed to show that there was a reasonable possibility that a different result would have been reached absent the alleged error.

**3. Homicide—second-degree murder—motion to dismiss—sufficiency of evidence—malice**

The trial court did not err by denying defendant's motion to dismiss and by entering judgment on the verdict of second-degree murder. The evidence was sufficient for a jury to find malice even in the absence of a finding that defendant's hands were a deadly weapon.

Appeal by defendant from judgment entered 4 March 2010 by Judge R. Stuart Albright in Randolph County Superior Court. Heard in the Court of Appeals 11 April 2011.

*Attorney General Roy Cooper, by Assistant Attorney General Sandra Wallace-Smith, for the State.*

*Glenn Gerding for defendant-appellant.*

GEER, Judge.

STATE v. TROGDON

[216 N.C. App. 15 (2011)]

Defendant Alex Jerome Trogdon appeals from his conviction of second degree murder of his girlfriend's 16-month-old son. He primarily contends on appeal that the trial court committed plain error by admitting expert testimony, a death certificate, and an autopsy report that the cause of the child's death was "homicide." Our review of the record indicates, however, that the expert witnesses and the exhibits did not use the word "homicide" as a legal term of art. Instead, the expert witnesses detailed the nature of the child's injuries, the processes by which such injuries could occur, and the relation of the injuries to the child's death. They then explained that the "manner of death" was "homicide" as opposed to accidental means. Because our Supreme Court has already held in *State v. Parker*, 354 N.C. 268, 553 S.E.2d 885 (2001), that an expert witness' use of the word "homicide" in this manner is permissible, we hold that the trial court did not err in admitting the challenged evidence.

## Facts

The State's evidence tended to show the following facts. In 2003, Christal Milton had three children: Tre'Shaun, who was 16 months old, and two older daughters. Ms. Milton and Tre'Shaun's father, Walter Lamont Williams, were no longer in a relationship together, but Mr. Williams would call and visit his son. Ms. Milton began dating defendant in July 2003.

Earlier, in January 2003, Tre'Shaun, who had been wheezing, was diagnosed as having asthma, a reflux-induced respiratory disease, and laryngomalacia, which is "a developmental abnormality of the inlet of the larynx." Individuals with this condition breathe in the flap of skin that covers the air way and make a whistle or wheezing type sound. In Tre'Shaun's case, this condition required only observation, and there was no indication that it was severe enough to obstruct Tre'Shaun's air way. His reflux was treated with the drug Nexium, and his asthma was treated with daily breathing treatments.

In November 2003, Ms. Milton and defendant planned to spend Thanksgiving together at Ms. Milton's home. However, Tre'Shaun's father, Mr. Williams, came to visit the children on Thanksgiving. Ms. Milton called defendant to let him know that Mr. Williams was there. Although Mr. Williams assured defendant that he was only there to visit the children, defendant became upset and refused to go over to Ms. Milton's home. He drove past the house more than once and called Ms. Milton complaining that "he's still there."

**STATE v. TROGDON**

[216 N.C. App. 15 (2011)]

The next day, defendant was very upset that Ms. Milton had let Mr. Williams visit. He did not trust Ms. Milton and thought that she and Mr. Williams were "trying to be together behind his back." Two days after Thanksgiving, when Ms. Milton and defendant were arguing again, defendant told her that Tre'Shaun "wasn't his damn kid, anyway." This statement upset Ms. Milton, and defendant apologized.

On approximately 8 December 2003, Tre'Shaun's sisters were carrying him upstairs and fell, tumbling down the steps. The next day, because of the fall, Ms. Milton took Tre'Shaun to the doctor and then to the hospital to have x-rays taken. The fall had not resulted in any head injuries, but Tre'Shaun had a knot and sore area on one of his ribs. Although his doctor suspected that the rib might be fractured, the x-ray showed that there was no fracture.

On 15 December 2003, Tre'Shaun was sick with a cold, fever, and diarrhea. Ms. Milton stayed home from work with him and took the children to a Christmas program at church. When they left the program, Ms. Milton was surprised to see that defendant was in the parking lot "to make sure [Ms. Milton] was there and how things went." That night, defendant spent the night at Ms. Milton's house but stayed downstairs watching television because he could not sleep.

The next morning, 16 December 2003, Ms. Milton took her daughters to daycare, briefly leaving Tre'Shaun at home with defendant. When she got home she brought Tre'Shaun downstairs, tried to get him to eat, and let him play with some toys. Ms. Milton decided to go to the grocery store to get some food she thought Tre'Shaun might eat and left Tre'Shaun with defendant. When she got home, defendant had gotten Tre'Shaun to eat a piece of cake. Tre'Shaun was crying, however, and defendant told Ms. Milton that she needed to change his diaper.

After changing the diaper, Ms. Milton gave Tre'Shaun some more food that he ate while Ms. Milton and defendant played Monopoly. Because Tre'Shaun looked like he was going to fall asleep, she put him down for a nap in the living room while she and defendant continued to play Monopoly. At about 4:30 p.m., Ms. Milton needed to go pick her daughters up from daycare. She asked defendant to watch Tre'Shaun once more while she was gone.

Ms. Milton returned home with her daughters approximately 30 minutes later. When she arrived, defendant was on the porch, telling her to "[h]urry up and come here." She went inside and saw Tre'Shaun propped in the corner of the couch, but slumped over. He looked bluish-grey in color.

She drove Tre'Shaun to Randolph Hospital's emergency room. Defendant sat in the passenger seat holding Tre'Shaun. Ms. Milton asked defendant what happened and why he did not call 911. Defendant told her that he did not know what happened—that Tre'Shaun just looked like he was not breathing. He said that he tried to call 911 twice and could not drive Tre'Shaun for help because his car was parked down the street.

Upon his arrival at the emergency room, at approximately 5:15 p.m., Tre'Shaun was placed on a ventilator. He was breathing with assistance, but he was comatose. Three hours later, Tre'Shaun was flown by helicopter to the intensive care unit of Brenner Children's Hospital in Winston-Salem. Defendant drove Ms. Milton to Winston-Salem, and, during the drive, told Ms. Milton that they should pray about the situation and when it was over, they could be a family.

At Brenner Children's Hospital, Tre'Shaun's pediatrician examined him—she believed that his condition was not the result of a cold, allergies, or a fall down the stairs. Dr. Thomas Nakagawa, a pediatric intensive care specialist at Brenner Children's Hospital, determined that Tre'Shaun had bleeding over the surface of the brain and massive brain swelling as a result of blunt force injury to his head and neck. As a result of the injury, Tre'Shaun was brain dead. Dr. Nakagawa concluded that Tre'Shaun's injuries resulted from his "head moving back and forth very rapidly and the head being slammed into some type of soft object."

According to Dr. Nakagawa, the head injuries likely occurred just before he was brought to the emergency room. After talking with Ms. Milton and defendant, Dr. Nakagawa decided that Tre'Shaun had no significant history that would account for his injuries. Dr. Nakagawa concluded that Tre'Shaun's injuries were non-accidental.

When defendant was questioned by the police, he first denied shaking or dropping Tre'Shaun. Defendant told the police that he went to the bathroom and, when he returned, Tre'Shaun was still asleep. Tre'Shaun, however, then raised and lowered his head and started breathing fast. His eyes were "laid back," and he was limp. Defendant said he tried to call 911, but the call did not go through so he laid the phone down. When he tried to call again, the phone did not ring. He claimed that he rocked Tre'Shaun, took him outside for fresh air, and breathed into his mouth. In a subsequent interview, defendant said that when Tre'Shaun did not wake up, he shook Tre'Shaun and hit him on the back.

STATE v. TROGDON

[216 N.C. App. 15 (2011)]

On 1 June 2004, defendant was indicted for first degree murder. The case was first tried in August 2006, but ended in a mistrial. It was tried again at the 23 February 2010 session of Randolph County Superior Court.

At trial, Dr. Ellen Riemer, the forensic pathologist who performed the autopsy of Tre'Shaun testified that he had bruises on the left side of his forehead, the back of his scalp, around his ear, on his tongue, and on the underside of the lips overlaying the teeth. There were two bruises that looked like bite marks on his left forearm and a bruise on the right side of his buttock. She also discovered hemorrhages underlying the bruises on his scalp, which included bleeding in his actual scalp. There was a subdural hemorrhage and subarachnoid hemorrhage of the brain and a bruise of the brain itself.

Dr. Riemer testified that she believed there were four blunt force impact sites on Tre'Shaun's skull. Dr. Riemer had concluded that the trauma was not consistent with an accidental fall, but rather was consistent with striking Tre'Shaun's head against an object.

According to Dr. Riemer, after receiving these injuries, Tre'Shaun would have immediately lost consciousness and been limp and unresponsive. He would have had a difficult time breathing, and would not have been able to eat, play, or interact after the injuries occurred. She concluded that Tre'Shaun's cause of death was acute brain injury with hemorrhage and edema due to blunt force trauma of the head and the manner of his death was homicide.

A forensic odontologist, Dr. Sarah Shoaf, also testified regarding the marks on the top and on the bottom of Tre'Shaun's arm that were suspected to be human bite marks. According to Dr. Shoaf, the two marks could not have been made at the same time because of their placement on the arm. After examining plaster casts of the teeth of Ms. Milton, her two daughters, Mr. Williams, and defendant, she then compared overlays created by scanning the casts with to-scale photographs of the bite marks on Tre'Shaun's arm. Dr. Shoaf concluded that defendant caused the bite marks on Tre'Shaun's arm.

At the close of the State's evidence, defendant moved to dismiss. After the court denied his motion, defendant presented no evidence. The jury was instructed on first degree murder based on malice, premeditation and deliberation; first degree murder based on felony murder; second degree murder; and involuntary manslaughter. The jury returned a verdict of guilty of second degree murder. The trial

court sentenced defendant to a presumptive-range term of 189 to 236 months imprisonment. Defendant timely appealed to this Court.

I

**[1]** Defendant first argues that the trial court erred by admitting (1) expert testimony, (2) a death certificate, and (3) an autopsy report, all of which identified Tre'Shaun's death as a homicide. Dr. Riemer who performed the autopsy testified without objection that "[t]he cause of death was acute brain injury with hemorrhage and edema due to blunt force trauma of [the] head. And the manner of death is homicide." The trial court then admitted without objection the death certificate prepared by Dr. Riemer identifying the cause of death as "homicide" and the autopsy report that set out her opinion that the manner of death was homicide. Dr. Nakagawa testified that he agreed with Dr. Riemer's opinions, including her conclusion that the manner of death was homicide.

Because defendant did not object to the admission of any of this evidence at trial, he now argues plain error.

> "[T]he plain error rule . . . is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a *fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done, or where [the error] is grave error which amounts to a denial of a fundamental right of the accused, or the error has resulted in a miscarriage of justice or in the denial to appellant of a fair trial or where the error is such as to seriously affect the fairness, integrity or public reputation of judicial proceedings or where it can be fairly said the instructional mistake had a probable impact on the jury's finding that the defendant was guilty."

*State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (quoting *United States v. McCaskill*, 676 F.2d 995, 1002 (4th Cir. 1982)).

Pursuant to N.C.R. Evid. 704, "[t]estimony in the form of an opinion or inference is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Our Supreme Court has explained, however:

> In interpreting Rule 704, this Court draws a distinction between testimony about legal standards or conclusions and factual premises. An expert may not testify regarding whether a legal standard or conclusion has been met at least where the standard

is a legal term of art which carries a specific legal meaning not readily apparent to the witness. Testimony about a legal conclusion based on certain facts is improper, while opinion testimony regarding underlying factual premises is allowable.

> For example, an expert may not testify regarding specific legal terms of art including whether a defendant deliberated before committing a crime. Additionally, a medical expert may not testify as to the "proximate cause" of a victim's death.

*Parker*, 354 N.C. at 289-90, 553 S.E.2d at 900 (internal citations and quotation marks omitted).

In *Parker*, the Court noted that it had previously held that "[t]here was no error . . . where an expert characterized a death with the term 'homicidal assault.' " *Id.* at 290, 553 S.E.2d at 900 (quoting *State v. Flippen*, 344 N.C. 689, 699, 477 S.E.2d 158, 164 (1996)). The Court explained that it had reached that conclusion because the term "homicidal assault" was " 'not a legal term of art, nor [did] it correlate to a criminal offense.' " *Id.* (quoting *Flippen*, 344 N.C. at 699, 477 S.E.2d at 164).

Applying *Flippen*, the *Parker* Court then concluded that a medical examiner's reference to a death as a "homicide" was likewise admissible:

> Dr. Thompson used the word "homicide" to explain the factual groundwork of his function as a medical examiner. Dr. Thompson did not use the word as a legal term of art. He explained how he determined the death was a homicide instead of death by natural causes, suicide, or accident. Dr. Thompson's testimony conveyed a proper opinion for an expert in forensic pathology, and the trial court properly allowed it.

*Parker*, 354 N.C. at 290, 553 S.E.2d at 900. *See also McNeil v. Pilot Life Ins. Co.*, 19 N.C. App. 348, 350-51, 198 S.E.2d 753, 755-56 (1973) (holding that "homicide" is defined only as " '[t]he act of a human being taking away the life of another' " and, while it often involves intentional acts, "[a]n *un*intended killing of one human being by another is also a homicide" (quoting *Black's Law Dictionary*, Fourth Edition)).

Based on our review of the record, we hold that *Parker* controls. Similar to the testimony in *Parker*, Drs. Riemer and Nakagawa's testimony described the nature of the injuries and how those injuries had resulted in the death of Tre'Shaun. Like the medical examiner in *Parker*, their testimony did not use "homicide" as a legal term of art, but rather as a means of describing how these injuries came to be

inflicted—the "manner of death" was a homicide and not through accidental means. In other words, neither witness (nor the two exhibits) provided evidence that amounted to a legal conclusion based on the facts. Instead, they testified as to the factual mechanism that resulted in Tre'Shaun's death. The trial court, therefore, did not err in admitting this evidence.

## II

**[2]** Defendant next contends that the trial court erred by allowing Dr. Shoaf to testify that, in her professional opinion, the bite marks on Tre'Shaun's arm were made by defendant. " 'A trial court has wide discretion in determining whether expert testimony is admissible, and may be reversed for an abuse of discretion only upon a showing that its ruling was so arbitrary that it could not have been the result of a reasoned decision.' " *State v. Crandell*, ___ N.C. App. ___, ___, 702 S.E.2d 352, 357 (2010) (quoting *State v. Washington*, 141 N.C. App. 354, 362, 540 S.E.2d 388, 395 (2000)), *disc. review denied*, ___ N.C. ___, 710 S.E.2d 34 (2011).

Defendant does not challenge the admissibility of Dr. Shoaf's testimony generally. Indeed, the trial court made detailed findings on the record regarding each prong of the test set out in *State v. Morgan*, 359 N.C. 131, 160, 604 S.E.2d 886, 903-04 (2004) (holding that "a trial court that is considering whether to admit proffered expert testimony pursuant to North Carolina Rule of Evidence 702 must conduct a three-step inquiry to determine: (1) whether the expert's proffered method of proof is reliable, (2) whether the witness presenting the evidence qualifies as an expert in that area, and (3) whether the evidence is relevant").

While defendant recognizes that "Dr. Shoaf could testify [defendant's] bite pattern was consistent with the bite pattern found on [Tre'Shaun's] arm," he contends that Dr. Shoaf "improperly invaded the province of the jury by testifying [that defendant] did in fact cause the bite mark." At trial, Dr. Shoaf first testified twice that the marks on the underside of Tre'Shaun's arm were "consistent" with a bite by defendant. The following then occurred:

Q. Now, did you put your findings in written form, Doctor?

A. Yes, I did.

[PROSECUTOR]: And if I may approach.

THE COURT: You may.

STATE v. TROGDON

[216 N.C. App. 15 (2011)]

[DEFENSE COUNSEL]: May we approach the bench? May we approach?

THE COURT: Yes, sir.

(There was a Bench conference with [the prosecutor] and [defense counsel] in attendance.)

THE COURT: All right. *Objection sustained at this time.*

Q. (By [PROSECUTOR]) Dr. Shoaf, in your opinion and based on your experience in forensic odontology, who made the bite mark on Tre'Shaun Williams?

[DEFENSE COUNSEL]: *Objection.*

THE COURT: Overruled.

A. Do I answer?

THE COURT: You may. You may answer.

A. Okay. In my professional opinion, the bite mark on Tre'Shaun Williams was made by [defendant].

(Emphasis added.) Dr. Shoaf was then asked to read her report to the jury, which similarly stated her opinion that the bite mark was made by defendant. Defense counsel did not specifically object to that portion of the report, but lodged an objection "for the record" when the State moved the admission of the report.

It is not apparent from the record that defendant objected at trial on the same basis that he raises on appeal. The only specific objection asserted was that Dr. Shoaf's testimony was not reliable under *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 597 S.E.2d 674 (2004). The record contains no indication that defendant ever specifically objected on the grounds that Dr. Shoaf's testimony was invading the province of the jury. Even assuming, without deciding, (1) that defendant did properly object and (2) that Dr. Shoaf's testimony that defendant had in fact made the bite mark was inadmissible, defendant has failed to show that "there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached" by the jury. N.C. Gen. Stat. § 15A-1443(a) (2009).

Dr. Shoaf explained that she examined the dentition of the five people who could have made the bite mark (Tre'Shaun's two sisters, Mr. Williams, Ms. Milton, and defendant); she analyzed the different types of dentition of the five individuals; and she explained how the

"bites" of each person compared to the bite mark on the underside of Tre'Shaun's arm. Dr. Shoaf testified that one sister had only baby teeth—her bite and teeth were too small to match. The second sister had mixed permanent and baby teeth, but the arch of her bite was too round and too small to fit the bite mark. Mr. Williams was missing teeth where the bite mark showed that teeth existed, leading Dr. Shoaf to conclude that he could not have made the bite mark. Ms. Milton had a more rounded bite while the bite mark on Tre'Shaun was squared off. In addition, her canine teeth did not correspond with the canine marks visible in the bite mark on Tre'Shaun. With respect to defendant, however, his bite was squared off like the bite mark on Tre'Shaun, and his canines corresponded to the position of the canines in the bite mark.

Based on her analysis, Dr. Shoaf testified on direct examination without objection, before expressing her conclusion that defendant had made the bite mark, that the bite mark was "consistent" with a bite from defendant's upper teeth and that the overlay made from defendant's cast "is the one that is most consistent" with the bite mark and is "consistent with [defendant's] making that bite mark." Dr. Shoaf subsequently displayed for the jury the overlay for each of the individuals, so that the jury could decide for itself whether to believe Dr. Shoaf's analysis.

On cross-examination, defense counsel repeated that Dr. Shoaf's conclusion that "the bite mark that [she] observed was consistent with the pattern of [defendant] was based upon [her] comparison of that and the four other—others, as well . . . ." Dr. Shoaf then acknowledged that she was not testifying that no one else "in the world" could have made the bite mark because bite marks are not like fingerprints—they are not different from everyone else's bite mark. She then agreed with defense counsel's statement that her "conclusion is, of the five you looked at, it's the only one that could have made the bite . . . ."

Thus, even if the challenged testimony had been omitted, the jury still would have heard Dr. Shoaf's detailed analysis of the overlays in relation to the actual bite mark; her conclusion on cross-examination (not challenged on appeal) that defendant's bite is "the only one that could have made the bite" mark on Tre'Shaun; and her repeated statements that defendant's overlay was the most consistent with the bite mark. In addition, the jury would still have had the opportunity to make its own determination of how the overlay of each individual fit with the photograph of the bite mark. Given this evidence, we cannot

conclude that the admission of the challenged testimony was preju-dicial under N.C. Gen. Stat. § 15A-1443(a).

III

**[3]** Finally, defendant contends the trial court erred in denying his motion to dismiss and in entering judgment on the verdict of second degree murder. Specifically, defendant argues that the State pre-sented insufficient evidence that he acted with malice for purposes of second degree murder and that the trial court should have submitted to the jury only the charge of involuntary manslaughter.

"This Court reviews the denial of a motion to dismiss for insuffi-cient evidence *de novo*." *State v. Robledo*, 193 N.C. App. 521, 525, 668 S.E.2d 91, 94 (2008). "In considering a motion to dismiss, the trial court must analyze the evidence in the light most favorable to the State and give the State the benefit of every reasonable inference from the evidence." *Parker*, 354 N.C. at 278, 553 S.E.2d at 894. "The trial court must also resolve any contradictions in the evidence in the State's favor." *Id.* "The trial court does not weigh the evidence, con-sider evidence unfavorable to the State, or determine any witness' credibility." *Id.*

In order for evidence to sustain a conviction it must be substan-tial. *Robledo*, 193 N.C. App. at 524, 668 S.E.2d at 94. " 'Evidence is sub-stantial if it is relevant and adequate to convince a reasonable mind to accept a conclusion.' " *Id.* at 525, 668 S.E.2d at 94 (quoting *State v. Robinson*, 355 N.C. 320, 336, 561 S.E.2d 245, 255 (2002)).

The essential elements of second degree murder are an unlawful killing of a human being with malice, but without premeditation and deliberation. *State v. Johnson*, 196 N.C. App. 330, 334, 674 S.E.2d 727, 730, *appeal dismissed*, 363 N.C. 378, 679 S.E.2d 395 (2009). *State v. Reynolds*, 307 N.C. 184, 191, 297 S.E.2d 532, 536 (1982), holds that "there are at least three kinds of malice." First, there is actual malice, meaning "express hatred, ill-will or spite." *Id.* The second type of mal-ice exists "when an act which is inherently dangerous to human life is done so recklessly and wantonly as to manifest a mind utterly with-out regard for human life and social duty and deliberately bent on mischief." *Id.* The third type of malice is a " 'condition of mind which prompts a person to take the life of another intentionally without just cause, excuse, or justification.' " *Id.* (quoting *State v. Foust*, 258 N.C. 453, 458, 128 S.E.2d 889, 893 (1963)).

Here, during its instruction on second degree murder, the trial court stated the following:

In order for you to find the Defendant guilty of second degree murder, the State must prove beyond a reasonable doubt that the Defendant intentionally and with malice wounded Tre'Shaun Lamont Williams with a deadly weapon thereby proximately causing his death. If the State proves beyond a reasonable doubt that the Defendant intentionally inflicted a wound upon Tre'Shaun Lamont Williams with a deadly weapon that proximately caused his death, you may infer, first, that the killing was unlawful and, second, that it was done with malice, but you are not compelled to do so.

You may also infer that the killing was unlawful and that it was done with malice, if you find from the evidence that the victim's death resulted from an attack by hand alone without the use of other weapons when the attack was made by a strong or mature person upon a weaker or defenseless person, but, again, you are not compelled to do so. You may consider the inferences along with all other facts and circumstances in determining whether the killing was unlawful and whether it was done with malice. If the killing was unlawful and was done with malice, the Defendant would be guilty of second degree murder.

And, again, a deadly weapon is a weapon which is likely to cause death or serious injury. In determining whether the hands of the Defendant were used as a deadly weapon, you should consider their nature, the manner in which they were used and the size and strength of the Defendant as compared to Tre'Shaun Lamont Williams.

Defendant contends that the trial court only instructed the jury on the third form of malice, i.e. where a person intentionally takes the life of another without cause, excuse or justification.[1] Although defendant acknowledges that the trial court instructed the jury both (1) that it could "infer [defendant] acted with malice if it found he used a deadly weapon, namely his hands," or (2) that it could "infer malice if it believed [defendant] attacked [Tre'Shaun] with hands alone without a deadly weapon if it found the attack was by a stronger person on a weaker person," defendant seems to argue only on appeal that the State "failed to present substantial evidence that [defendant] used a deadly weapon to intentionally injur[e] [Tre'Shaun]."

---

1. The trial court, when defining malice for the jury during its first-degree murder instruction, included the other forms of malice.

**STATE v. TROGDON**

[216 N.C. App. 15 (2011)]

We need not address that argument since the evidence was sufficient for a jury to find malice even in the absence of a finding that defendant's hands were a deadly weapon. Although defendant attempts to characterize his actions in shaking Tre'Shaun as an overreaction intended to revive the child, his contentions would require us to view the evidence in the light most favorable to defendant. When the proper standard of review is applied, however, we conclude that the jury could find that defendant acted with malice.

Based on the expert testimony, the jury could reasonably conclude that Tre'Shaun did not die from his medical conditions or from his fall on the stairs. Further, the jury could reasonably reject defendant's claim that he simply shook Tre'Shaun in an attempt to revive him. The jury could find instead that during the time while Tre'Shaun was in the sole custody of defendant, Tre'Shaun suffered non-accidental injuries to the head with acute brain injury due to blunt force trauma of the head. The evidence would permit a finding that Tre'Shaun suffered a minimum of four impacts to the head, most likely due to his head being slammed into some type of soft object.

When this evidence is combined with the evidence permitting the jury to find that defendant bit Tre'Shaun, that defendant was extremely upset about Ms. Milton's relationship with Tre'Shaun's father, and that defendant resented Tre'Shaun, the jury could find that defendant intentionally attacked the 16-month-old child, resulting in his death. This evidence was sufficient to support the charge of second degree murder. *See State v. Murphy*, 172 N.C. App. 734, 745, 616 S.E.2d 567, 574 (2005) ("[W]hile malice is not necessarily inferred where death results from an attack upon a strong or mature person, malice may be inferred where death results from an attack made by a strong person and inflicted upon a young child, because '[s]uch an attack is reasonably likely to result in death or serious bodily injury' to the child." (quoting *State v. Elliott*, 344 N.C. 242, 269, 475 S.E.2d 202, 213 (1996))), *disc. review denied in part*, 361 N.C. 176, 641 S.E.2d 309, *vacated in part on other grounds*, 361 N.C. 164, 696 S.E.2d 527 (2006). Defendant has, therefore, failed to demonstrate that the trial court erred in denying his motion to dismiss and in entering judgment on the verdict of second degree murder.

No error.

Chief Judge MARTIN and Judge ELMORE concur.