An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA13-776

NORTH CAROLINA COURT OF APPEALS

Filed: 20 May 2014

STATE OF NORTH CAROLINA

v.                                  Guilford County
                                    No. 10 CRS 72489
WINFRED SCOTT SIMPSON,
        Defendant.


Appeal by defendant from judgment entered 3 January 2013 by Judge Edgar B. Gregory in Guilford County Superior Court. Heard in the Court of Appeals 11 December 2013.

> *Attorney General Roy Cooper, by Assistant Attorney General Nicholaos G. Vlahos, for the State.*

> *Michael E. Casterline for defendant-appellant.*


GEER, Judge.

Defendant appeals from his conviction of first degree murder of his wife Retha Simpson. On appeal, defendant primarily contends that the trial court erred in denying his motion to dismiss the charge of first degree murder because there was insufficient evidence that defendant acted with premeditation and deliberation. Our review of the record, however, indicates that there was substantial evidence from

which a reasonable juror could conclude that defendant acted with premeditation and deliberation in killing his wife. Because we find his additional arguments unpersuasive, we find that defendant received a trial free of prejudicial error.

## Facts

The State's evidence tended to show the following facts. Beginning in late 2009, defendant and his wife Retha were having marital problems. In October 2009, Retha discovered that defendant had been having an affair. Although she wanted to leave defendant, she was a full-time student and financially dependent on defendant who worked at UPS. She, therefore, decided to "suffer through" her relationship with him. As a solution to their marital problems, defendant and Retha joined a swinger's club in Charlotte, North Carolina. Retha bartended at the club while defendant "participated in events" at the club.

On 19 March 2010, Retha had plans with her best friend, Lori Hudson ("Ms. Hudson"), to meet for lunch and a movie. Around noon that Friday, Ms. Hudson called Retha to confirm their plans. Retha told Ms. Hudson that she had to cancel because she and defendant had been arguing throughout the night. Retha also told Ms. Hudson that she wanted to remove herself from defendant's cell phone plan so that defendant would not have access to her information. Ms. Hudson could hear defendant

in the background and was not able to get any more details about their argument. When Ms. Hudson called Retha later that afternoon, her cell phone was disconnected.

The following day, Ms. Hudson called defendant's house to check in on Retha. Defendant answered and told Ms. Hudson that Retha had "left the village." He said that he had Retha's cell phone service terminated and he did not know how to reach her. Defendant's demeanor was "pleasant," and he "sounded happy" during the conversation.

Throughout the weekend, Ms. Hudson was unable to get in touch with Retha. Ms. Hudson reached out to mutual friends on Facebook, but none of them had seen or heard from Retha. On Monday, 22 March 2010, Ms. Hudson spoke to defendant again. Defendant clarified that when he said that Retha had "left the village," he meant that she had left him for another man. Ms. Hudson knew that something was not right because defendant also told her that Retha had not taken her community college books, her car was still in the driveway, and no one knew anything about the other man. Ms. Hudson told defendant that if he did not report Retha missing, she would.

The following morning, defendant reported Retha missing. He told Deputy Carl T. Dill of the Guilford County Sheriff's Office that Retha was bipolar and had recently changed her

medication, so she had been experiencing mood swings. When defendant came home from work on 18 March 2010, he found Retha talking to another man on the internet. After confronting her, defendant learned that she had been having an affair for the previous six months. The couple argued throughout the night, and when defendant left for work around 3:00 p.m. the following day, Retha was still in bed crying over their argument. When he came home from work on 19 March 2010, Retha's car was still in the driveway, but Retha was not home and her clothes, medication, and purse were missing.

Defendant told Deputy Dill that he did not know how to get in touch with Retha because he had her cell phone service disconnected. Defendant claimed that he did not have any access to Retha's bank account or credit card information, and he did not know the name of the man with whom Retha had been having an affair. Deputy Dill called all of Retha's friends but no one had heard from her.

On 24 March 2010, the Greensboro Police Department responded to a call that someone had discovered charred human remains in a wooded area near Thurston Avenue in Greensboro, North Carolina. Police found what appeared to be two human legs wrapped in black plastic and bound in wire. Other body parts were identified as officers collected the pieces and put them in

four body bags. No shoes or clothing were found with the remains, and officers noticed an oily film on many of the body parts. About three feet and 12 feet away from the remains was a black oily ring of residue measuring about 22 inches in diameter. There were also tire impressions in the muddy portions of the roadway at the scene.

The detective assigned to Retha's missing person case, Detective Robert Cheek of the Guilford County Sheriff's Office, received a call that a body had been found, and he determined that the remains fit the description of Retha. Detective Cheek and Detective George Moore went to defendant's residence to talk to him. When they arrived at the front door, they heard the sound of a vacuum cleaner inside. They had to knock two or three times before defendant turned off the vacuum cleaner and answered the door. Defendant answered the door out of breath and wearing only a pair of jean shorts with red stains on them. While they spoke with defendant, Detective Moore noticed a brand-new, empty box of carpet shampoo on the hearth of the fireplace in the living room. He also saw through a window that a 55 gallon metal barrel was on the back porch.

Defendant allowed the detectives to look around his residence. Detective Moore found a can of lighter fluid in the kitchen. In the master bathroom, Detective Moore noticed

several red stains on the bathtub, wall, blinds, and furniture. The closet of the master bedroom contained very few women's clothes and many empty hangers. On the back porch, there was a carpet shampooer, a hand truck, a hose, a broom, a shovel, and a 55 gallon metal barrel. During a more thorough search pursuant to a warrant, Detective Moore found Retha's purse and UPS boxes filled with her clothing in the attic. The purse contained Retha's driver's license and other personal belongings.

DNA testing of samples of the red stains from the master bedroom and bathroom matched Retha's DNA profile, and the charred remains were identified as Retha's remains. Officers also received information from defendant's neighbor that a fire had been burning in the barrel on defendant's deck beginning 19 March 2010 and lasting two consecutive days.

Defendant was indicted for first degree murder. At trial, defendant testified in his own defense that Retha had a history of mental health issues and had been diagnosed with borderline personality disorder and bipolar disorder. During their relationship, she was both physically and verbally abusive towards defendant. She told defendant that she could hurt him or kill him, and get away with it because she was mentally ill. At various times during their marriage, she threatened to poison,

shoot, castrate, and attack defendant while he slept. She would belittle his masculinity, sometimes in front of their friends.

Defendant and Retha would sometimes playfully rough-house, but occasionally Retha would cross the line from playfulness to hurting defendant. She outweighed defendant by 100 pounds and would use her weight to push him onto the ground or up against a wall, dig her nails into him, or twist his arm or leg. Once, at Retha's request, defendant submitted to being tied face-down on their bed and blindfolded. Retha then anally assaulted defendant with a strap-on sexual device. She refused to stop when he asked her to, and instead taunted him about his manliness. The assault injured defendant so badly that he required surgery to repair the damage.

On 19 March 2010, Retha was angry with defendant after he had used her laptop without her permission to check on her online activity. Retha began yelling in defendant's face and pushing him, trying to provoke defendant. Defendant tried to defuse the situation by locking himself in the upstairs bathroom to shower and get ready for his shift at UPS. However, Retha picked the lock and burst into the bathroom. She yanked back the shower curtain and shoved defendant, causing him to slip and fall in the bathtub. Defendant was frightened and threatened to

call the police. Retha grabbed a bath brush and started beating defendant on the head and shoulders.

When defendant realized that his head was bleeding, he panicked because he believed that she was trying to kill him. He grabbed the brush from her, threw it down, and tried to run out of the bathroom. Retha wrapped her arms around his legs causing him to fall to the floor and smash his foot through the bathroom vanity door. Retha then started hitting him with her fists. Defendant grabbed her arm and pulled her down onto her hands and knees. She kept trying to hit him, so he decided to try to immobilize her with a sleeper hold. He put his right arm under her head, grabbed his right wrist with his left hand, and applied pressure to the sides of her neck until she went limp. He then got up and ran into the bedroom.

When Retha did not get up after a few seconds, defendant went back into the bathroom to check on her. He rolled her over to find that her face was blue and she was not breathing. He administered CPR, but was unable to revive her.

Afterwards, defendant was scared, confused, and in a state of shock. He took a number of Retha's anti-anxiety and anti-psychosis pills to calm himself down. He then went to work. Because he did not immediately report Retha's death, he decided that he would have to hide the fact that she had died, even

though it was accidental. Her body was too large to move from the bathroom, so the following day, he covered her body with plastic, removed her limbs with a reciprocating saw, and placed the pieces of her body into a metal barrel. He moved the barrel to the back yard, lit a fire and burned the contents for three days. On the night of Tuesday, 23 March 2010, he put the barrel in the back of his pickup truck, drove down a dirt road and dumped the contents into the woods.

After his arrest, defendant was examined by a forensic psychologist and a forensic psychiatrist. They each testified in his defense at trial. The psychologist diagnosed defendant with clinical symptoms of major depression recurrent without psychosis, unspecified anxiety disorder, and features of Asperger's syndrome. According to the psychologist, defendant was highly anxious, prone to depression of suicidal proportions, with many negative feelings about himself, dependent, self-effacing, introverted, shy, and withdrawn. The psychologist did not see any evidence that defendant was a violent person or prone to acting out. Instead, he determined that defendant dealt with his aggressive feelings and negative emotions by turning them inward on himself. He felt defendant had been truthful in reporting the events of Retha's death and that the details were consistent with the evidence presented at trial.

The psychiatrist diagnosed defendant with clinical symptoms of major depressive disorder and found that he had been physically and sexually abused. She attributed defendant's behavior after Retha's death to his feelings of guilt and shame that emotionally overwhelmed defendant and caused him to have impaired judgment.

Defendant moved to dismiss the charge of first degree murder at the close of the State's evidence and again at the close of all evidence. The trial court denied both motions, and the jury returned a verdict of guilty of first degree murder. The trial court sentenced defendant to life imprisonment without parole. Defendant timely appealed to this Court.

I

Defendant first argues that the trial court erred in excluding evidence of Retha's criminal conviction for assaulting a man in a previous relationship. Out of the presence of the jury, the defendant tendered to the trial court a copy of Retha's criminal history, which included a conviction for simple assault in 1992. Defendant argued that this evidence was relevant to defendant's state of mind at the time of Retha's death and was offered to support the defense's theory that defendant acted in self-defense.

Implicitly accepting that the evidence was relevant to defendant's theory of self-defense, the judge nevertheless ruled:

> [Y]ou may ask [defendant] what [Retha] said about [the assault] but I'm not going to allow any evidence, any -- any documentary evidence about it. Certainly wouldn't allow this kind of evidence in about a defendant. And I understand the reasons but I rule under 403 that under the balancing test that the probative value is substantially outweighed by the considerations of time and not needing to go there.

Subsequently, the trial judge allowed admission of defendant's testimony, over the State's objection, that Retha "used to tell me that she used to beat the hell out of [the father of her illegitimate child]" and that she "used her assault on the father of her son as kind of a threat" against the defendant.

Rule 403 of the Rules of Evidence provides for the exclusion of otherwise admissible evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." We review a trial court's decision to exclude evidence under Rule 403 for abuse of discretion. *State v. Whaley*, 362 N.C. 156, 160, 655 S.E.2d 388, 390 (2008). "An abuse of discretion occurs when a trial judge's ruling is 'manifestly unsupported by reason.'" *State v.*

*Summers*, 177 N.C. App. 691, 697, 629 S.E.2d 902, 907 (2006) (quoting *State v. Riddick*, 315 N.C. 749, 756, 340 S.E.2d 55, 59 (1986)).

Here, the trial judge applied the Rule 403 balancing test and concluded that the probative value of the 1992 conviction for civil assault was substantially outweighed by considerations of time. Given that the trial court admitted defendant's testimony regarding what Retha had told him about assaulting her prior boyfriend and given that defendant's knowledge of the prior assault was the only information relevant to the issues at trial, we hold that the trial court did not abuse its discretion in excluding the victim's 18-year-old conviction. *See State v. Jacobs*, 363 N.C. 815, 822, 689 S.E.2d 859, 864 (2010) (holding copies of victim's prior convictions admissible when defendant offered evidence to show that defendant knew of these "certain violent acts by the victim").

II

Next, defendant argues that the trial court erred in admitting expert testimony from Dr. Simmons that the cause of death was "undetermined homicidal violence." Defendant asserts that the expert's conclusion "did not derive from his examination of the victim or from scientific knowledge; rather, it was derived from the underlying facts by the sort of

reasoning process entirely within the capability of an average juror." Further, he argues that this conclusion "amounted to an opinion that the death was not accidental" and "an expert opinion as to [defendant's] state of mind."

Pursuant to Rule 702(a) of the Rules of Evidence, "[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion . . . ." An expert opinion is admissible if the witness is in a better position than the trier of fact to have an opinion. *State v. Wilkerson*, 295 N.C. 559, 568-69, 247 S.E.2d 905, 911 (1978).

In *State v. Annadale*, 329 N.C. 557, 573, 406 S.E.2d 837, 847 (1991), our Supreme Court rejected the defendant's argument that the State's forensic pathologist was in no better position than the jury to render an opinion as to the victim's cause of death. In *Annadale*, the remains of the victim's body included only the skull and various bones such as vertebrae, backbones, rib bones, a portion of the sacrum, and hip bones. *Id.* at 565, 406 S.E.2d at 842. Despite the lack of physical evidence indicating cause of death, the forensic pathologist listed the cause of death as "'incision of the throat,'" which was based

upon information received from law enforcement. *Id.* at 573, 406 S.E.2d at 847. He further testified, among other things, that the victim's death was the result of violence or injury trauma rather than natural disease. *Id.*, 406 S.E.2d at 846.

In finding that the trial court did not err in admitting the forensic pathologist's opinion, our Supreme Court held:

> Dr. Butts serves as the State's Chief Medical Examiner. He was accepted as an expert in forensic pathology and was allowed to testify as an expert witness. As a forensic pathologist, Dr. Butts was well qualified to provide testimony which was within his area of expertise and helpful to the jurors. Dr. Butts was subject to thorough cross-examination by defendant concerning his testimony, and any apparent discrepancies therein. The trial judge did not err in permitting Dr. Butts to give his opinion as to the cause of the victim's death.

*Id.*, 406 S.E.2d at 847.

Likewise, in this case, Dr. Simmons was accepted as an expert in forensic pathology, he thoroughly examined Retha's remains, received additional information from law enforcement, and, based on his knowledge, skill, experience, training, and education as a forensic pathologist, determined that Retha's cause of death was "undetermined homicidal violence." Dr. Simmons was also subject to thorough cross-examination by defense counsel concerning his testimony and any apparent discrepancies in that testimony.

Defendant's argument that the expert's opinion as to the cause of death constituted a legal conclusion was expressly rejected by this Court in *State v. Parker*, 354 N.C. 268, 290, 553 S.E.2d 885, 900 (2001), which held that a medical examiner's conclusion that the victim's death was a "homicide" was admissible:

> Dr. Thompson used the word "homicide" to explain the factual groundwork of his function as a medical examiner. Dr. Thompson did not use the word as a legal term of art. He explained how he determined the death was a homicide instead of death by natural causes, suicide, or accident. Dr. Thompson's testimony conveyed a proper opinion for an expert in forensic pathology, and the trial court properly allowed it.

*See also State v. Trogdon*, 216 N.C. App. 15, 21-22, 715 S.E.2d 635, 639-40 (2011) (applying *Parker* and holding expert testimony that death was "homicide" properly admitted where "homicide" not used "as a legal term of art, but rather as a means of describing how the[] injuries came to be inflicted -- the 'manner of death' was a homicide and not through accidental means").

In this case, similarly, Dr. Simmons did not use "homicide" as a conclusion regarding defendant's state of mind when he killed Retha, but rather as a conclusion regarding the manner in which she died -- that it was not a natural death. Dr. Simmons explained that the term "undetermined homicidal violence" is "a

convention from our office and the chief medical examiner's office" that is used "in cases where there is not enough information to suggest any other cause or manner of death than homicide, but there's also not necessarily enough information to figure out specifically why the person died based on the evidence available at the time of autopsy."

Review of similar cases in which an expert testified regarding a victim's cause of death suggests that "homicidal violence" is an appropriate and accepted cause of death among forensic pathologists. *See State v. Gregory*, 340 N.C. 365, 381, 459 S.E.2d 638, 647 (1995) (noting victims' bodies were in an advanced state of decomposition and autopsy revealed that one victim died from "undetermined homicidal violence"); *State v. Patel*, 217 N.C. App. 50, 56, 719 S.E.2d 101, 106 (2011) (noting expert in forensic pathology testified that victim's cause of death was "'homicidal violence of undetermined type'"), *disc. review denied*, 365 N.C. 551, 720 S.E.2d 395 (2012); *State v. Johnson*, 196 N.C. App. 330, 332, 674 S.E.2d 727, 729 (2009) (noting expert forensic pathologist testified that victim died of "'unspecified homicidal violence'" but most likely asphyxiation). Accordingly, we hold that the trial court did not err in admitting Dr. Simmons' testimony.

III

Finally, defendant argues that the trial court erred in denying his motion to dismiss the charge of first degree murder. "'Upon defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied.'" *State v. Fritsch*, 351 N.C. 373, 378, 526 S.E.2d 451, 455 (2000) (quoting *State v. Barnes*, 334 N.C. 67, 75, 430 S.E.2d 914, 918 (1993)). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith*, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980). "In making its determination, the trial court must consider all evidence admitted, whether competent or incompetent, in the light most favorable to the State, giving the State the benefit of every reasonable inference and resolving any contradictions in its favor." *State v. Rose*, 339 N.C. 172, 192, 451 S.E.2d 211, 223 (1994). "This Court reviews the trial court's denial of a motion to dismiss *de novo*." *State v. Smith*, 186 N.C. App. 57, 62, 650 S.E.2d 29, 33 (2007).

Defendant contends that there was insufficient evidence that defendant intentionally killed Retha with premeditation and deliberation. "'Premeditation means that the defendant thought

about the killing for some length of time, however short, before he killed.'" *State v. Bass*, 190 N.C. App. 339, 342, 660 S.E.2d 123, 126 (2008) (quoting *State v. Fields*, 315 N.C. 191, 200, 337 S.E.2d 518, 524 (1985)). "'Deliberation means that the intent to kill was formulated in a cool state of blood, one not under the influence of a violent passion suddenly aroused by some lawful or just cause or legal provocation.'" *Id.* at 342-43, 660 S.E.2d at 126 (quoting *Fields*, 315 N.C. at 200, 337 S.E.2d at 524).

Defendant argues that the State's evidence regarding whether the killing was premeditated was insufficient because it was circumstantial and "evidence of [defendant's] conduct *after* Retha's death is insufficient to prove his state of mind *prior* to her death." We disagree.

Our Supreme Court has explained that "[p]remeditation and deliberation generally must be established by circumstantial evidence, because both are processes of the mind not ordinarily susceptible to proof by direct evidence." *State v. Rose*, 335 N.C. 301, 318, 439 S.E.2d 518, 527 (1994), *overruled in part on other grounds by State v. Buchanan*, 353 N.C. 332, 543 S.E.2d 823 (2001).

The following circumstances are relevant to the existence of premeditation and deliberation:

> "(1) want of provocation on the part of the deceased; (2) the conduct and statements of the defendant before and after the killing; (3) threats and declarations of the defendant before and during the course of the occurrence giving rise to the death of the deceased; (4) ill will or previous difficulty between the parties; (5) the dealing of lethal blows after the deceased has been felled and rendered helpless; and (6) evidence that the killing was done in a brutal manner."

*State v. Williams*, 144 N.C. App. 526, 530, 548 S.E.2d 802, 805 (2001) (quoting *State v. Hamlet*, 312 N.C. 162, 170, 321 S.E.2d 837, 843 (1984)), *aff'd per curiam*, 355 N.C. 272, 559 S.E.2d 787 (2002).

The evidence shows that prior to the killing, defendant and Retha were having significant marital problems. Defendant had committed adultery six months prior. The night before Retha's death, they got into a fight after defendant used Retha's computer because he suspected her of cheating. The following day, Retha cancelled plans with her best friend because she and defendant continued to fight, and Retha told her best friend that she wanted to remove herself from defendant's cell phone plan so that he would not have access to her information.

After Retha was killed, defendant did not immediately notify the authorities. Instead, he took measures to try to cover up her death and hide the body. He sawed off her limbs, placed her body parts in a barrel, burned her body for three

days, and then dumped her remains in the woods. Our Supreme Court has held that burning a victim's body after death is "evidence from which a jury could infer premeditation and deliberation." *Rose*, 335 N.C. at 319, 439 S.E.2d at 527. *See also State v. Battle*, 322 N.C. 69, 73, 366 S.E.2d 454, 457 (1988) (concluding that defendant's demand that two witnesses help him dispose of victim's body by burning it was evidence of premeditation and deliberation); *Patel*, 217 N.C. App. at 62, 719 S.E.2d at 109 (holding "fact that [victim's] body was burned after she was killed constitutes additional evidence of premeditation and deliberation").

Additionally, defendant created a web of lies to cover up what he had done. When Ms. Hudson called the house to check on Retha the day after her death, defendant, with a "pleasant" demeanor and sounding "happy," told Ms. Hudson that Retha had "left the village." He also told Ms. Hudson that he had cancelled Retha's cell phone service and did not know how to reach her. He emailed the swinger's club in Charlotte to let them know he and Retha were no longer together and that Retha "won't be back" to the swinger's club. He hid Retha's clothes and purse in the attic to make it look like she had left him and attempted to clean the blood from the bathroom and bedroom. Finally, he did not report Retha missing until three days after

her death, and he only did so then because Ms. Hudson threatened to report Retha missing if defendant did not.

The evidence of defendant's and Retha's marital troubles and argument immediately preceding her death, the mutilation, burning, and disposal of Retha's body, and defendant's lying in an attempt to cover up her death constitute substantial evidence from which a reasonable jury could conclude that defendant intentionally killed Retha with premeditation and deliberation. Although defendant points to evidence in the record that supports his contention that he did not intend to kill Retha and that her death was the result of an accident after defendant acted in self- defense, it was up to the jury to determine the credibility and weight of the evidence presented. Defendant's argument amounts to a request that this Court view the evidence in the light most favorable to defendant, which is contrary to our standard of review. Accordingly, the trial court did not err in denying his motion to dismiss.

No error.

Judges BRYANT and CALABRIA concur.

Report per Rule 30(e).