An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA13-1147
NORTH CAROLINA COURT OF APPEALS

Filed: 1 April 2014

STATE OF NORTH CAROLINA

    v.

KATHY WELLS YORK

Alamance County
No. 12 CRS 52478


Appeal by Defendant from judgment entered 2 May 2013 by Judge James E. Hardin, Jr., in Alamance County Superior Court. Heard in the Court of Appeals 5 March 2014.

> *Attorney General Roy Cooper, by Special Deputy Attorney General Kathryn J. Thomas, for the State.*

> *Rudolf Widenhouse & Fialko, by M. Gordon Widenhouse, Jr., for Defendant.*


STEPHENS, Judge.


*Factual and Procedural Background*

Defendant Kathy Wells York appeals from the trial court's entry of judgment based upon her conviction of resisting a public officer. The evidence at trial tended to show the following: On 29 April 2012, Defendant and her husband went to a local Belk department store so that Defendant could purchase

some blouses for an upcoming trip. Defendant had recently gotten eyeglasses with a new prescription, and the glasses were making her nauseated. While shopping, Defendant felt sick and gave several items to her husband to purchase while Defendant went to the store restroom. What occurred next was disputed at trial.

According to Defendant, after vomiting in the restroom, Defendant washed her face and freshened her makeup. As she left the restroom, Defendant took a purse from the top of the paper towel holder, assuming it was her own make-up case. She purchased several tops and left the store without incident. Once home, Defendant discovered the purse was not her own. She and her husband found a phone number on the cellphone in the purse and called it. Defendant and her husband were able to reach a man who identified himself as Michelle Shamberger's husband. Defendant explained that she had Shamberger's purse and agreed to return to Belk to give the purse back to Shamberger.

The State's witnesses presented a different version of these events. Shamberger was an employee at Belk. She testified that she had left her purse on top of the paper towel holder in the store's restroom while on a break. She noticed

another woman wash her hands and leave the restroom with her purse. Shamberger called out to the woman, but the woman did not stop. Shamberger worked with a store loss prevention specialist, to determine what had happened to her purse. After reviewing store video tapes, Shamberger identified Defendant as the woman in the bathroom when her purse disappeared.

Officers Cameron Leight and Christopher Smith of the Burlington Police Department were called to the store. Smith called the cellphone Shamberger had left in her purse. A woman answered, but when Smith identified himself as a police officer, the call was disconnected. A few minutes later, Leight received a return call from the cellphone that had been in Shamberger's purse. It was Defendant, stating that she had found a purse and cellphone and was going to return them to Belk.

When Defendant and her husband pulled up to the sidewalk outside Belk, they saw a man, a woman, and two uniformed police officers, Leight and Smith. Defendant walked toward the woman, who was standing near one of the officers, as the other officer approached the car where Defendant's husband was waiting. Defendant handed the purse to Shamberger who confirmed that nothing was missing. At that point, Leight told Defendant she was under arrest for larceny. Defendant turned, crossed her

arms, and called out to her husband. Leight testified that Defendant said, "No, no," and backed away from him. Leight put Defendant's arms behind her back, handcuffed her, and arrested her.

Defendant was charged with misdemeanor larceny and misdemeanor resisting a public officer. At the close of the State's evidence and at the close of all the evidence, Defendant moved to dismiss the charge of resisting a public officer. The trial court denied both motions. The jury acquitted Defendant of larceny, but found her guilty of resisting a public officer. The trial court sentenced Defendant to 30 days in the custody of the Alamance County Sheriff, suspended for 18 months upon her completion of 18 months of supervised probation, payment of a fine, completion of community service hours, and adherence to a ban on contacting Leight or visiting Belk during her probation. This appealed followed.

*Discussion*

Defendant argues that the trial court erred in failing to dismiss the charge of resisting a public officer because (1) the State offered no evidence to show that Leight was attempting to make a lawful arrest and (2) Leight's investigation of the alleged larceny had been completed. We vacate.

The law governing a trial court's ruling on a motion to dismiss is well established. The trial court must determine only whether there is substantial evidence of each essential element of the offense charged and of the defendant being the perpetrator of the offense. Evidence is substantial if it is relevant and adequate to convince a reasonable mind to accept a conclusion. In considering a motion to dismiss, the trial court must analyze the evidence in the light most favorable to the State and give the State the benefit of every reasonable inference from the evidence. The trial court must also resolve any contradictions in the evidence in the State's favor. The trial court does not weigh the evidence, consider evidence unfavorable to the State, or determine any witness[] credibility.

*State v. Parker*, 354 N.C. 268, 278, 553 S.E.2d 885, 894 (2001) (citations and internal quotation marks omitted), *cert. denied*, 535 U.S. 1114, 153 L. Ed. 2d 162 (2002).

The five elements of the offense of resisting a public officer are:

1) that the victim was a public officer;

2) that the defendant knew or had reasonable grounds to believe that the victim was a public officer;

3) that the victim was discharging or attempting to discharge a duty of his office;

4) that the defendant resisted, delayed, or obstructed the victim in discharging or attempting to discharge a duty of his office; and

> 5) that the defendant acted willfully and unlawfully, that is intentionally and without justification or excuse.

*State v. Dammons*, 159 N.C. App. 284, 294, 583 S.E.2d 606, 612, *disc. review denied*, 357 N.C. 579, 589 S.E.2d 133 (2003), *cert. denied*, 541 U.S. 951, 158 L. Ed. 2d 382 (2004).

On appeal, Defendant bases her arguments upon an assertion that the State failed to establish element 3, to wit, that Leight was discharging or attempting to discharge a duty of his office when Defendant resisted him. Defendant first contends that Leight's attempt to arrest Defendant was illegal such that she was justified in resisting. This contention is based upon Defendant's assertion that Leight had not observed her alleged offense, misdemeanor larceny, and thus was authorized to arrest her without a warrant only under limited conditions not present here. Unfortunately, Defendant did not make this argument in the trial court. Rather, Defendant argued for dismissal by asserting that Defendant did not actually resist, delay, or obstruct Leight in the course of his performance of his duties. Accordingly, Defendant has not preserved this argument for appellate review. *See* N.C.R. App. P. 10(a)(1). However, Defendant asks this Court to invoke Rule 2 of our Rules of Appellate Procedure in order to reach the merits of her

argument, and we elect to exercise our discretion to do so. *See* N.C.R. App. P. 2 ("To prevent manifest injustice to a party . . . either court of the appellate division may . . . suspend or vary the requirements or provisions of any of these rules in a case pending before it upon application of a party or upon its own initiative, and may order proceedings in accordance with its directions.").

Our General Statutes provide that a law enforcement officer may arrest a suspect without a warrant if the officer has probable cause to believe the suspect has committed a misdemeanor offense *in the officer's presence*. N.C. Gen. Stat. § 15A-401(b)(1) (2013). In contrast, for misdemeanor offenses not personally witnessed by a law enforcement officer, warrantless arrests are permitted *only* where the officer has probable cause to think that the suspect

> 1. Will not be apprehended unless immediately arrested, or
>
> 2. May cause physical injury to h[er]self or others, or damage to property unless immediately arrested[.]

N.C. Gen. Stat. § 15A-401(b)(2).[1]

---

[1] The statute also permits the warrantless arrest of suspects for offenses not committed in the officer's presence in the case of a list of specified misdemeanors, none of which is applicable

"The essential elements of larceny are that the defendant: (1) took the property of another; (2) carried it away; (3) without the owner's consent; and (4) with the intent to deprive the owner of his property permanently." *State v. Perry*, 305 N.C. 225, 233, 287 S.E.2d 810, 815 (1982) (citations and internal quotation marks omitted), *overruled on other grounds by State v. Mumford*, 364 N.C. 394, 699 S.E.2d 911 (2010). Here, it is undisputed that Defendant did not take or carry away Shamberger's purse in Leight's presence. Leight was not called to Belk until after Defendant had taken the purse and left Belk. At that point, the alleged offense of misdemeanor larceny had been completed. Accordingly, we must consider whether either condition set forth in section 15A-401(b)(2) was satisfied here.

No evidence offered at trial could support a belief by Leight that Defendant was likely to "cause physical injury to h[er]self or others, or damage to property unless immediately arrested[.]" N.C. Gen. Stat. § 15A-401(b)(2). Defendant had already returned the purse to Shamberger undamaged and with all of its contents intact. Nothing suggested that Defendant was

_____

here. *Id.*

likely to become violent so as to injure herself, others, or any property.

Likewise, the evidence produced at trial reveals no basis which would provide Leight probable cause to believe that Defendant would not be apprehended unless immediately arrested. *See id.* Leight testified that Defendant called the cellphone in Shamberger's purse, explained what had happened, and promised to return to Belk with the purse. Defendant did then return to Belk, driven by her husband, where she restored the purse with all its contents intact to Shamberger, and responded to all of Leight's questions:

> Q[.] And did you make contact with [Defendant] when she arrived?
>
> A[.] I did. She gave the change purse to Ms. Shamberger. Said, "Here I found your purse," and gave it to her. And Ms. Shamberger replied to her. I don't recall exactly what she said. She said something to [Defendant]. At that time, when she handed it to her and stated, "Here, I found this," I told [Defendant] that I observed her on camera inside the store and observed her taking the, that she walked out of the store. And she first saying she found it in the parking lot. After I told her that we had video surveillance, she then claimed that it was her wallet or she thought it was her wallet. And she said, "Well, I grabbed it by accident. I thought it was my wallet," after telling me that she found it in the parking lot.

Q[.] In response to her changing her story to saying that she grabbed it by accident, what did you do?

A[.] Umm, again I explained to her that the time that I initially got the call that I responded was approximately 6:10. This was a little bit after 8 o'clock. The time the incident occurred was about 4:40. So between 4:40 and 8 o'clock, you're talking three and a half hours that this had happened. So she returned approximately three and a half hours after the purse had been taken. So I basically told her, you know, I have you on video. I know you didn't find it in the parking lot. And she, that's when she replied, "Well, I took it by mistake. I thought it was mine."

Q[.] And what happened after that?

A[.] At that time, I told her she was under arrest for larceny.

Even by Leight's own account, nothing about Defendant's actions or the circumstances indicated a likelihood that Defendant would not be apprehended unless immediately arrested. The State emphasizes that Defendant delayed in returning the purse to Belk and gave inconsistent explanations about where she found the purse.[2] At most, these facts *might* provide probable

---

[2] Defendant testified that, after leaving Belk, she and her husband drove to another mall so that Defendant could have a manicure and pedicure for her upcoming trip. After the manicure and pedicure, Defendant and her husband ate dinner at the mall before returning to their home. Defendant did not realize she had picked up Shamberger's purse until she was unpacking her

cause for Leight to believe that Defendant had indeed committed larceny, but neither is relevant to assessing whether Defendant would likely evade apprehension unless immediately arrested.

Circumstances that do appear relevant include that Defendant voluntarily returned to Belk within ten minutes of speaking to Leight on Shamberger's cellphone, was accompanied by her husband, returned the purse, and cooperated with Leight. Prior to Leight's attempt to arrest Defendant, she showed absolutely no sign that she would stop cooperatively answering Leight's questions, much less that she would flee or take steps to avoid later apprehension. It seems more likely that a suspect who *did* plan to evade apprehension might take simple steps such as disposing of the stolen item and refusing to return to the scene of the alleged crime when requested to do so. Such a suspect might not have her husband drive her to the scene in their car to return the allegedly stolen item, thus providing officers an opportunity to obtain her license plate number. Such a suspect might tell her husband to keep driving once she saw uniformed officers at the scene, rather than to engage in conversation with one of them, thereby giving the officer an opportunity to get a good look at her face and

purchases at home.

possibly ask for her identification. Surprisingly, the transcript does not indicate that Leight ever asked for Defendant's name or address or to see her driver's license prior to placing her under arrest. Had Leight done so, he might have been able to take down sufficient information to feel confident that he could locate Defendant later as needed. Simply put, Leight never evinced any belief that Defendant would likely avoid later apprehension if he did not immediately arrest her, and absolutely nothing in the record would support such a belief. Thus, Leight's attempted arrest of Defendant was unlawful and she was lawfully entitled to resist it. Accordingly, the judgment entered upon Defendant's conviction for resisting a public officer is

VACATED.

Judges BRYANT and DILLON concur.

Report per Rule 30(e).